## RE HARBECK.

PATENTS; NOVELTY; UTILITY.

1. Where the question of patentability is close, the doubt should be resolved in favor of the applicant. (Following *In re Eastwood*, 33 App. D. C. 291.)

2. While the use of new materials to produce a known result, or of known materials to produce a new but obvious result, may not always con-

stitute invention, if the new idea, when applied, brings success out of failure, produces a new and useful result, and saving in operation or production, or efficiency instead of inefficiency, gives to the device new functions and useful properties, it is invention, and patentable.

3. A paper vessel, the walls of which are formed of layers of paper held together by a fused cement, and are impervious to gases or moisture, constitutes a patentable invention.

Patent Appeals. No. 821. Submitted November 21, 1912. Decided February 3, 1913.

HEARING on an appeal from a decision of the Commissioner of Patents rejecting an application for a patent. *Reversed.*

The facts are stated in the opinion.

*Messrs. Munday, Ewarts, Adcock, & Clarke* and *Mr. H. N. Low* for the appellant.

*Mr. Robert F. Whitehead* for the Commissioner of Patents.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

This is an appeal from the Commissioner of Patents refusing a patent to appellant Jervis R. Harbeck, for a device consisting of a paper vessel, the walls of which are formed by layers of paper held together by a fused cement. The claims are as follows:

"1. The vessel having walls made of layers of paper united to each other by a fused cement.

"2. The can body composed of oblong layers of paper cemented to each other step fashion by a fused cement, and having its stepped ends cemented together by the fusible cement, and caused to adhere to each other by the application of heat.

"3. The can body composed of layers of paper cemented together by fused cement and creased with three creases to facilitate bending at the corners into a square form and to flatten for shipment.

"4. The can body composed of layers of paper cemented together by fused cement and creased to facilitate bending at the corners into a square form, a plurality of creases being given for each corner that the corner may be rounded to facilitate the crimping or seaming of the sheet-metal heads on the body.

"5. The combination of the can body made of layers of paper cemented together by fused cement and made to adhere by the application of heat, and having sheet-metal heads applied thereto.

"6. The combination of the can body made of layers of paper cemented together by fused cement and having sheet-metal heads applied thereto, said can body being made square with creased rounded corners, and said heads being rounded at the corners to correspond."

Appellant describes the invention in his specification as follows: "The vessels made in this manner, wherein the layers are cemented by a cement consisting of a fusible compound united by application of heat, as contradistinguished from the ordinary cements employed in similar relation, are much more thoroughly water and grease proof than such paper vessels seamed or built up by the employment of such solvent softened pastes or cements. Because, in order to harden solvent softened cement, the solvent must be dried out, which it can only do by passing through the layers of paper between which it is placed, and which escape of the solvent through the paper tends to leave both the paper and the cement in a state where they are pervious to water and grease, especially the latter. And this impervious character of the can body built up of layers of paper united by fusible cement is specially valuable where the can or vessel is to be used for containing aromatic foods, such as coffee, tea, etc., as will be readily understood."

The principal feature of the invention consists in the use of fused cement, instead of a soluble adhesive. It is claimed that all former efforts in this direction, and numerous patents are cited, have proved defective, in that soluble adhesive or cement was used, and, when the solvent evaporated or dried out, it left the walls of the vessel porous, and not impervious to gases

or moisture. Overcoming this defect is the problem appellant claims to have solved. Not only is no solvent used in appellant's cement, but he claims to use a combination which gives rise to no objectionable odors when his vessel is put into use.

In all the references cited, the pastes, glues, or cements used in adhering or cementing the layers of paper or other material together are softened by solvents, which require a drying out or evaporating process. Appellant's discovery, as suggested, in cementing together the layers of paper by a fusing process, consists of rolling the cemented layers of paper between heated rolls, thus eliminating the drying out or evaporating process.

No evidence was taken nor were affidavits called for in the Patent Office. The statement of appellant in his application must be accepted as true. The facts of discovery and of utility are admitted. It is not contended that impervious sheets made of layers of paper united by fused cement capable of being converted into air-tight and water-proof vessels were in prior use. The application was rejected by the Patent Office for the reason that the change from the prior art, where the sheets were made of layers of paper united by the use of soluble cement, to the use of fused cement, which, according to the specification, marked the transition from failure to success in this art, was a mere mechanical step, capable of being taken by any one skilled in the art. The references cited indicate the antiquity of the art. Numerous attempts have been made to solve the problem, but the step applicant took seems not to have suggested itself to any of them.

The most ancient reference given is the patent granted to one Jaloureau, February 10, 1863. It consisted in an "improved process of manufacturing waterproof cement pipes" for "conveying and holding liquids or gases, and for other purposes, from sheets or rolls of paper, or other tissue." He saturated the sheets of paper with an adhesive, and rolled them upon a mandrel. The adhesive was composed of "liquid, bituminous, or other equivalent mastic. * * * Bituminouus or equivalent mastic or cement may be used, but bituminous mastic, made in the usual manner of asphalt or coal tar, in admixture with

earthly substances, is preferred." He described an adhesive of such a nature that it had to be dried out. After describing the drying process, the specification continues: "After the above operation, the mastic coating is permitted to cool, which may be accelerated by a shower of cold water, and after the formed tube or pipe is cooled, the mandrel can be taken out by simply standing it on end and giving it a few knocks. Until the several coatings of mastic become thoroughly dry the tube or pipe thus formed is liable to get out of shape; and to prevent this, when the iron mandrel is taken out, all that is necessary is to insert a wooden mandrel. After the mastic has become dry and indurated, the paper sleeve may be removed. * * * The inside of the pipe may be coated. * * * Instead of the inner coating of mastic a thin tube of glass or earthenware may be put upon the mandrel, and, by the process above described, covered with paper." It will be observed that Jaloureau not only used a solvent which dried out after cooling, but, from his provision for an inside lining of the pipe, either with mastic or a glass tube, he does not seem to have had any conception of so combining the paper and adhesive alone that they would be impervious.

The nearest approach to appellant's discovery is found in the patent to Johnson referred to in the Commissioner's decision. Johnson secured a patent for what he called an "impervious wrapping paper." He described it as "a thin, adhesive, flexible paste, impervious to air and water, which is inodorous and will not decompose, can be made of a compound of caoutchouc and paraffin or caoutchouc and Japan wax; and two sheets of Manila paper, attached together by this paste, spread only on the inner or contactual sides, make a combined sheet that is soft, pliable, tough, and cheap, impervious to air and water, and efficient for an impervious wrapping paper." Johnson does not explain the manner of dissolving the substances used, but he does describe it as "a paste, spread only on the inner or contactual sides" of the paper. Nowhere does he refer to a fusing process. It is doubtful if a paste composed in part of caoutchouc (India rubber) would fuse, and, in view of

subsequent efforts by inventors, with Johnson's invention in the field, it is reasonable to conclude he used a solvent to reduce the ingredients to a paste.

The Commissioner summarily disposes of the case as follows: "It is argued by the applicant that the adhesive used by Johnson is not a fused cement. It is not stated in the Johnson patent that the layers of the paper are caused to adhere to each other by the application of heat, but even if the adhesive used by Johnson is not a fusible cement, it would certainly not require invention to use such a cement in view of the other references cited by the Examiner against claim 1. The patents to Conley and Jones show a can body made of layers of paper cemented together. It would obviously require no invention to use the particular kind of paper shown in the patent to Johnson for this purpose."

The Jones patent, cited as a controlling reference, is for a can or vessel with its walls constructed of two thicknesses of pasteboard and an intercalated sheet of tinfoil. Jones placed the tinfoil between the layers of paper to make the paper wall impervious.

The Conley patent has even less bearing on the present issue than the Jones device. It consisted of a wrapper for tobacco, and is described by the patentee as belonging "to that class of wrappers known as foil wrappers, which are extensively used in packing tobacco and other articles." In his specification he describes the construction and utility of the wrappers as follows: "I take a sheet of oil and a sheet of paper and secure them together, face to face, in any suitable manner, as, for instance, by means of thin zones of adhesive material, leaving at one end of the wrapper a tongue or strip of foil projecting from the edge of the paper and a tongue or strip of paper projecting from the edge of the foil. It will be observed that when the wrapper is used to envelop a package, the projecting tongue or strip of foil may be brought against a foil surface, so as to form an air-tight joint. * * * The value of foil as a wrapper lies chiefly in its preserving, as nearly as possible, the original qualities of the contents of the package which it envelops by prevent-

ing the escape of moisture from within and by excluding there-
from external air and water." It therefore appears that Con-
ley relied entirely upon the tinfoil to secure imperviousness.

With constructive notice, at least, of Johnson's patent, which
was issued twelve years before the patent to Conley and twenty
years before Jones entered the field in 1903, it does not seem
to have been apparent to either of these inventors, whom it must
be assumed knew the state of the art, that the problem could be
solved by using a fused cement. While neither of these patents,
we think, anticipates appellant's invention, since the devices
are entirely different in structure from appellant's device, it
is inconceivable that, if they had possessed knowledge of the
fusing process, they would have adopted the more expensive and
cumbersome method of attaching to the layers of paper a metal-
lic substance to secure imperviousness, which was the chief
object sought by both inventors.

It is easy to dispose of a case, where the issue of invention is
close, by holding that the advance over the prior art constitutes
a mere mechanical change apparent to those skilled in the art.
But, in the absence of proof to support this conclusion, and
where the question of patentability is close, the doubt should be
resolved in favor of the applicant. *Re Eastwood,* 33 App. D. C.
291. In *Smith* v. *Goodyear Dental Vulcanite Co.* 93 U. S. 486,
23 L. ed. 952, the court was considering the patentability of a
method of making artificial teeth. It was urged that it was not
a patentable invention, but that it consisted of a mere mechanic-
al substitution of vulcanite for other materials which had long
been used as a base for artificial teeth,—the use of one material
for another in the formation of a product. But in disposing of
this contention the court said: "It is evident this is much more
than employing hard rubber to perform the functions that had
been performed by other materials, such as gold, silver, tin,
platinum, or gutta-percha. A new product was the result, dif-
fering from all that had preceded it, not merely in degree of
usefulness and excellence, but differing in kind, having new
uses and properties." In the same case the court quoted with
approval from Webster on Patents, as follows: "The utility

of the change, as ascertained by its consequences, is the real practical test of the sufficiency of an invention; and since the one cannot exist without the other, the existence of the one may be presumed on proof of the existence of the other. Where the utility is proved to exist in any degree, a sufficiency of invention to support the patent must be presumed." The court also distinguished the case of *Hotchkiss* v. *Greenwood,* 11 How. 248, 13 L. ed. 683, in the following language: "The patent in that case was for an .improvement in making door and other knobs for doors, locks, and furniture, and the improvement consisted in making them of clay or porcelain, in the same manner in which knobs of iron, brass, wood, or glass had been previously made. Neither the clay knob nor the described method of attaching it to the shank was novel. The improvement, therefore, was nothing more than the substitution of one material for another in constructing an article. The clay or porcelain doorknob had no properties or functions which other door-knobs made of different materials had not. It was cheaper, and perhaps more durable, but it could be applied to no new use, and it remedied no defects which existed in other knobs. Hence it was ruled that the alleged improvement was not a patentable invention. The case does decide that employing one known material in place of another is not invention, if the result be only greater cheapness and durability of the product. But this is all. It does not decide that no use of one material in lieu of another in the formation of a manufacture can, in any case, amount to invention, or be the subject of a patent. If such a substitution involves a new mode of construction, or develops new uses and properties of the article formed, it may amount to invention. The substitution may be something more than formal. It may require contrivance, in which case the mode of making it would be patentable or the result may be the production of an analogous but substantially different manufacture. This was intimated very clearly in the case of *Hicks* v. *Kelsey,* 18 Wall. 670, 21 L. ed. 852, where it was said: 'The use of one material, instead of another, in constructing a known machine, is, in most cases, so obviously a matter of mere me-

chanical judgment, and not of invention, that it cannot be called an invention, unless some new and useful result, as increase of efficiency, or a decided saving in the operation, be obtained.' "

This, we think, conclusively confirms appellant's right to a patent. While the use of new materials to produce a known result, or of known materials to produce a new but obvious result, may not always constitute invention, if the new idea, when applied, brings success out of failure, produces a new and useful result and saving in operation or production, or efficiency instead of inefficiency, gives to the device new functions and useful properties, it is invention, and may be patented. Appellant has met these requirements. His situation, as disclosed by this record, is most aptly stated in *Webster Loom Co.* v. *Higgins,* 105 U. S. 580, 26 L. ed. 1177, as follows: "It is further argued, however, that, supposing the devices to be sufficiently described, they do not show any invention; and that the combination set forth in the fifth claim is a mere aggregation of old devices, already well known; and therefore it is not patentable. This argument would be sound if the combination claimed by Webster was an obvious one for attaining the advantages proposed,—one which would occur to any mechanic skilled in the art. But it is plain from the evidence, and from the very fact that it was not sooner adopted and used, that it did not, for years, occur in this light to even the most skilful persons. It may have been under their very eyes, they may almost be said to have stumbled over it; but they certainly failed to see it, or to estimate its value, and to bring it into notice. * * * Now that it has succeeded, it may seem very plain to anyone that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention."

We are of opinion that appellant has discovered something new and useful, and has demonstrated its utility. These are the elements which enter into patentable invention. As the

court said in *Diamond Rubber Co.* v. *Consolidated Rubber Tire Co.* 220 U. S. 428, 434, 55 L. ed. 527, 530, 31 Sup. Ct. Rep. 444: "This satisfies the law, which only requires as a condition of its protection that the world be given something new and that the world be taught how to use it. It is no concern of the world whether the principle upon which the new construction acts be obvious or obscure, so that it inheres in the new construction." In other words, the inventive discovery made by appellant consisted in an intelligent apprehension of the elements entering into the device and the bringing of them together in such a relation as to produce a new and useful article of commerce. The extent to which he modified or altered existing inventions is unimportant, since he accomplished a new and beneficial result not so obvious as to suggest itself to those skilled in the art. It remained for appellant to discover the hidden cause that marked the line between failure and success. In *Diamond Rubber Co.* v. *Consolidated Rubber Tire Co.* supra, the court divides patentable invention into two classes, as follows: "In other words, the invention may be broadly new, subjecting all that comes after it to tribute (*Chicago & N. W. R. Co.* v. *Sayles,* 97 U. S. 554, 556, 24 L. ed. 1053, 1054) ; it may be the successor, in a sense, of all that went before, a step only in the march of improvement, and limited, therefore, to its precise form and elements." The invention in this case belongs to the latter class. It is the successor of all former attempts to develop this particular art. It marks a step,—an improvement, —perhaps not the final one, but none the less important.

As to appellant's claims, the first and second are the only ones which have any direct relation to the use of a fused cement, instead of a solvent, in making impervious paper walls for use in the construction of vessels. These claims will be allowed. Claims 3, 4, 5, and 6 are disallowed for the reason that they disclose nothing new over the prior art, as shown in a number of the references cited. The decision of the Commissioner of Patents is reversed, and the clerk is directed to certify these proceedings as by law required.                    *Reversed.*