KIRSCH MFG. CO. v. GOULD MERSEREAU CO., Inc.

(Circuit Court of Appeals, Second Circuit, March 2, 1925.)

No. 219.

1. Patents ⟨⟩328—Kirsch, 1,240,582, for sectional curtain rod, held invalid for lack of invention.

The Kirsch patent, No. 1,240,582, for sectional curtain rod, *held* not to disclose inventions over the rod of No. 1,142,438 to the same patentee.

2. Patents ⟨⟩20—Objective test of patentability is not absolute.

The objective test of invention, as that one may not patent as an invention the making in one part of what was formerly made in two, is not absolute, but the question is one of evidence in each case.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Kirsch Manufacturing Company against the Gould Mersereau Company, Inc. Decree for defendant, and complainant appeals. Affirmed.

Dyrenforth, Lee, Chritton & Wiles, of Chicago, Ill., and Briesen & Schrenk, of New York City (John H. Lee and Wm. H. Dyrenforth, both of Chicago, Ill., and Hans Briesen, of New York City, of counsel), for appellant.

Williams & Pritchard, of New York City (Wm. S. Pritchard, of New York City, of counsel), for appellee.

Before HOUGH, MANTON, and HAND, Circuit Judges.

HAND, Circuit Judge. [1] This appeal arises on the usual suit in equity upon a patent issued to C. W. Kirsch on September

---

[1] Judge Mayer concurred in this opinion, but resigned before it was handed down.

18, 1917 (No. 1,240,582). It involves only claim 7, which reads as follows:

"A sectional curtain rod, comprising two similar tubular end members, one thereof of a size to be telescopically received within the other, and a coupling member interposed between the two end members fitting telescopically within the larger of said end members at one end, and fitting telescopically upon the other end member at its other end."

There had for some years been curtain rods circular in section made in several parts which telescoped: Muehlebach, 668,923, February 26, 1901; Blake, 935,885, October 5, 1909. But Kirsch's invention was not of that kind. He depended for the rigidity of his rod upon flat strips of metal, rounded over at each edge to form grooves, and set up with the flat sides vertical. Lazear, 847,344, seems to have been the first, October 27, 1906, to apply for a flat strip rod in two sections; but these had no rounded edges, and the pieces, being held together by clamps, did not telescope at all. So far as appears, Kirsch was the first to disclose truly telescoping sections of the kind here in question, which he did in his application of December 8, 1906, which resulted on April 9, 1907, in his first patent, 850,089. This rod was in two curved end sections, one of which obviously had to be smaller than the other, so as to be able to be inserted within it. An alternative form was, however, shown; the two curved end pieces being of equal size, united by an intermediate and straight coupler large enough to fit over the ends of each.

The two end pieces permitted of adjustability within the length of the two single members, but were not sufficient when the window was too wide. His alternative form could be used in that case; but, as we have said, it required end pieces of the same size. It proved convenient to pack together end pieces which would normally telescope, and, in order to use the alternative form of the first disclosure, it was therefore necessary to break two packages and take the smaller parts from each, using a larger intermediate part as a coupler. This was a serious inconvenience, and after the end of about six years, on September 23, 1912, Kirsch applied for a second patent, which issued on June 8, 1915 (No. 1,142,438), in which he disclosed a modification of his original invention.

One feature of this disclosure, perhaps the principal, was certain elliptical disks which would lock the ends of the telescoped members in position after they had been adjusted (page 1, lines 17 and 18, of the spec-

ifications); but the disclosure was of two straight pieces of different size, one of which would slip over the end of one end piece, and the other within the other end piece. The figures represent these two coupling pieces as united into one by the fixing disks, and both claims are for "a certain rod including a pair of channel-shaped members," such that one is slipped within the other and held fast by the disks. The second patent must therefore be regarded as disclosing a single coupler with ends of different sizes, adapted to be used with the usual end pieces, and not requiring the breaking of a package and reassortment between packages. It does not, however, appear that in practice the two separate straight pieces which went to make up such a unitary coupler were assembled, except when the rods were set up on the job.

The change from the second patent to the patent in suit consisted only in this: The disclosure of a single intermediate coupling member, made of one piece of metal, one end of which was large enough to receive the smaller of the two curved end pieces, and the other end small enough to enter the larger. The bore of the coupling member was therefore of the size of the larger end member to its middle, where it was suddenly contracted to the size of the smaller. The invention thus permitted the use of an indefinite number of couplers with any single set of end members, and avoided the inconveniences theretofore existing.

This patent, as we have said, appeared in September, 1917, though the device had gone upon the market some time in 1915. In 1916 the patented extension sections or couplers sold to the amount of about $28,000, and by 1923 they had reached over $250,000. It does not appear in the proof how large were the sales of the end sections disclosed in the first patent, except that in 1923 they amounted to three times that of the extension members. The record, therefore, does not enable us to say how much the increase of the plaintiff's business in curtain rods was dependent upon the new extension members; but it is apparent that they are but a small part of the whole.

In our judgment, the disclosure of the second patent accomplishes substantially the same result as that of the third, and the difference in means did not require invention. To this we must add one qualification: The single member of the second patent required an overlap of between four and six inches necessary to secure rigidity between the two straight parts. There was in this a waste of metal, and moreover it prevented adjus-

tability over that distance, so that the ends might have to be cut. To the patent in suit must therefore be credited an economy of metal and an improvement in adjustability, due to making the two parts into one. The turning point of the case is whether an invention may rest upon so narrow a basis.

[2] Although in such matters there is always a doubt, we are disposed to take the same view as the learned District Judge, who thought that the second patent ran too close to the third to give room for any invention. In so deciding we take no recourse to any supposed absolute objective test, as, for example, that one may not patent as an invention the making into one part of what formerly was in two. In spite of our language in General Electric Co. v. Yost Manufacturing Co., 139 F. 568, 71 C. C. A. 552, language which has been repeated again and again, we think that such tests are delusive, if used as more than rough rules for guidance. The question is one of evidence in each case, and the issue necessarily depends upon a shifting standard, just as in cases of due care.

Objective tests may be of value vaguely to give us a sense of direction, but the final destination can be only loosely indicated. An invention is a new display of ingenuity beyond the compass of the routineer, and in the end that is all that can be said about it. Courts cannot avoid the duty of divining as best they can what the day to day capacity of the ordinary artisan will produce. This they attempt by looking at the history of the art, the occasion for the invention, its success, its independent repetition at about the same time, and the state of the underlying art, which was a condition upon its appearance at all. Yet, when all is said, there will remain cases when we can only fall back upon such good sense as we may have, and in these we cannot help exposing the inventor to the hazard inherent in hypostatizing such modifications in the existing arts as are within the limited imagination of the journeyman. There comes a point when the question must be resolved by a subjective opinion as to what seems an easy step and what does not. We must try to correct our standard by such objective references as we can, but in the end the judgment will appear, and no doubt be, to a large extent personal, and in that sense arbitrary.

Assuming as we must that Kirsch's second patent disclosed a single coupling rod made up of two pieces rigidly joined by his locking disks, it seems to us an obvious modification to manufacture the two pieces into

one, and that in fact is all that he did. From that idea it necessarily followed that the overlapping space could be eliminated, both in the interest of economy and of a somewhat nicer adaptability. We do not feel free to attribute the success of the patent in suit to the difference between the two-part coupler disclosed in the second patent and the single piece of the third. Indeed, there is no evidence that Kirsch ever attempted to exploit the second patent as one coupling rod, as it is disclosed in its claims. What might have been its success rests in supposition, and makes of slight value the evidence from commercial exploitation. Hence we agree with the learned District Judge that the second patent exhausted any invention attributable to the patent in suit.

Decree affirmed.