**CARBIDE & CARBON CHEMICALS COR-
PORATION et al. v. COE, Commissioner
of Patents.**

No. 7029.

United States Court of Appeals for the
District of Columbia.

Decided Dec. 29, 1938.

EDGERTON, Associate Justice, dissenting.

Charles H. Potter, of Washington, D.
C., and Emory P. Boynton, of New York
City, for appellants.

R. F. Whitehead, Solicitor, United
States Patent Office, of Washington, D. C.,
for appellee.

Before GRONER, Chief Justice, and
STEPHENS and EDGERTON, Associate
Justices.

STEPHENS, Associate Justice.

This is an appeal from a decree of the
District Court of the United States for the
District of Columbia dismissing, after a
hearing on the merits, a bill of complaint
filed by the appellants under Rev.Stat. §
4915, as amended, 35 U.S.C.A. § 63. The

bill sought to require the appellee United States Commissioner of Patents, hereafter referred to as the Commissioner, to issue a patent upon the application of Ralph B. Frazier, Serial No. 605,129, for certain new and useful improvements in food packages. The application will be referred to hereafter as the Frazier application. The application, the rights under which had been assigned to the appellant Carbide and Carbon Chemicals Corporation, was duly prosecuted in the Patent Office, and the primary examiner finally rejected claims 4, 5, 6, 7, 8, 11, 13, 14 and 22. This rejection was affirmed by the Board of Appeals. In the hearing in the trial court the record in the Patent Office was as usual introduced in evidence; and there was also heard testimony by Frazier, Frank R. Stoner, Jr., and Arthur K. Doolittle, as experts. At the conclusion of the hearing, the trial judge ruled that no invention was disclosed by the application. The sole question in this appeal is as to the correctness of this ruling in respect of the claims mentioned.

From Frazier's application and the testimony in the trial court, the following appears: The principal object of the claimed invention is "to provide improved composite materials for use particularly in packaging foodstuffs." Metal foil and metal cans, commonly used in such packaging to prevent desiccation and spoilage, are often corroded by contact with the foodstuff with resultant contamination and deterioration of the foodstuff itself. This occurs, for example, in the packaging of cheese in metal foil and of orange juice and beer in metal cans. The problem in the art was to discover a coating which would render metal packaging material, whether foil or cans, resistant to chemical action by elements contained in foodstuffs to be packaged, and also render metal foil packaging material impervious to exterior gases, moisture, grease and oils; it was also essential that the coating in contact with the foodstuff should be free from volatile or soluble constituents which might impart an odor or taste thereto.

Frazier testified that while employed by the Carbide and Carbon Chemicals Corporation upon a fellowship in the Mellon Institute, where his duties comprised working with solvents, experimenting with nitrocellulose lacquers with which the solvents were used, and developing uses for new products such as vinyl resins, an inquiry was received from a European country asking for a coating to protect tinfoil for food packaging. An inquiry had also been received from an American company for a coating for foil to be used in packaging cheese. In this the problem was to prevent corrosion of the foil which gave rise to darkening of the cheese and to gas formation. Knowing that in the nitrocellulose lacquers tough films adhering to metal foils were available, Frazier thought first of the use of such a lacquer. Foil was coated at the laboratory by a spray application, two nitrocellulose lacquers of the best formula which could be developed being used; and one application was made with vinyl resin in it. The nitrocellulose lacquer samples were not successful—they produced an odor; and no more tests were made with them. But the foil coated with vinyl resin showed promise. Similar problems were investigated for can manufacturing companies in respect of coating tin cans for the packaging of vegetables, orange juice and the like. The results of the tests of vinyl resins in metallic food containers showed definitely that the coating would not impart odor or taste to the product and the tests were successful. They were however not entirely as expected; although Frazier had been working for a considerable period of time before this with vinyl resin coating compositions, they turned out in these tests to be better than he had reason to expect.

Frazier stated in his specification that he had:

" . . . discovered by test that the object of the invention may be attained, and new composite materials may be produced by providing metallic materials used for packaging purposes, particularly for foodstuffs, with a surface or surfaces which contain vinyl resins, that is, resinous products resulting from the polymerization[1] of certain vinyl compounds. . . .

"Vinyl resins suitable for use in forming the materials of my inventions may be formed from vinyl esters by known poly-

1 "Polymerization is the chemical process in which relatively simple molecules of a compound become complex by combination amongst themselves. The term 'polymerization resin' is used to distinguish a resin which is formed directly by the polymerization of a chemical compound, without passing through a preliminary stage of condensation. Polymerization is usually initiated by the action of light, heat, strong acids or alkalis." Alan A. Drummond, Resins, 19 Encyclopedia Britannica (14th ed., 1932) 210, 212.

merization processes. The polymerization products of inorganic vinyl esters, such as vinyl halides, or those of organic vinyl esters, such as vinyl esters of aliphatic acids may be used. I prefer to use vinyl resins resulting from the conjoint polymerization (by which is meant polymerization of a plurality of compounds while in mutual contact) of two or more vinyl esters. For example, vinyl resins having desirable properties may be prepared by the conjoint polymerization of a vinyl halide and a vinyl ester of an aliphatic acid. Products of the conjoint polymerization of vinyl chloride and vinyl acetate in proportions ranging from about 10% to 90% by weight of the chloride are particularly desirable. Such resins are substantially water-white and transparent and they are exceptionally resistant to acids, alkalies and salts in the presence of moisture and may be used to form tough, flexible films which adhere well to metals, and which are odorless and tasteless. In addition, I have found that the characteristics of the preferred vinyl resins are retained to a very great extent when the vinyl resin is modified by the addition of a second resin or gum, a cellulose ester or a high-boiling solvent having plasticizing or softening action on the resin. Due to this property the vinyl resins may be greatly modified to meet specific requirements without materially altering the chemical properties of the resins which are necessary to the materials of this invention.

"The material of my invention may be prepared by coating the metallic packaging material, at least on the surface thereof which is to be contacted with the packaged product, with a vinyl resin or vinyl resin composition. This may be done conveniently by forming a solution of the resin with or without modifying materials, applying the solution to the metal, and eliminating the solvent."

The specification gives several examples of proportions which may be used to accomplish the result of the invention. It is explained in the testimony that after the elimination of the solvent the film thus dried may be baked to insure adhesion to the metal or foil.

The claims: Claim 4 is typical of claims 4, 5, and 6, and reads as follows:

"4. A food package comprising a metallic material having at least the surface thereof which is in contact with the food product to be packaged composed of a composition which contains a substantial proportion of a vinyl resin of the group including polymerization products of vinyl esters and mixtures of vinyl esters."

The remaining claims are as follows:

"7. A food package which comprises a food product and a metallic packaging material having at least the surface thereof which contacts the packaged product composed of a composition which contains a vinyl resin substantially identical with a product resulting from the conjoint polymerization of vinyl chloride and vinyl acetate in the proportions of about 60% to 90% by weight vinyl chloride.

"8. A food package which comprises a food product and a metallic packaging material having at least the surface thereof which contacts the packaged product composed of a composition which contains a vinyl resin substantially identical with a product resulting from the conjoint polymerization of vinyl chloride and vinyl acetate in the proportions of less than about 65% by weight vinyl chloride, together with nitrocellulose.

"11. Process of protectively packaging food products which comprises enclosing the food product in a metallic packaging material which has at least the surface thereof which is in contact with said food product composed of a composition which contains a substantial proportion of a vinyl resin of the group including polymerization products of vinyl esters and mixtures of vinyl esters.

"13. As a new product, a package comprising cheese enclosed by and substantially sealed in a wrapping consisting essentially of metal foil which has at least the surface thereof in contact with said cheese composed of a composition which contains a substantial proportion of vinyl resin of the group including polymerization products of vinyl esters and mixtures of vinyl esters.

"14. As a new product, a package comprising cheese enclosed by and substantially sealed in a wrapping consisting essentially of metal foil which has at least the surface thereof in contact with said cheese composed of a composition which contains a vinyl resin substantially identical with a product resulting from the conjoint polymerization of vinyl acetate and vinyl chloride in the proportions of about 60% to 90% by weight vinyl chloride.

"22. Process of protectively packaging cheese, which comprises pouring heated

molten cheese into molds lined with a metallic packaging material which has at least the surface thereof which is in contact with the said cheese composed of a composition containing a substantial proportion of a vinyl resin of the group including polymerization products of vinyl esters and mixtures of vinyl esters, together with a plasticizer, thereby slightly softening the vinyl resin and causing lapped portions of the said surface of the packaging material to be effectively sealed."

According to the testimony, Frazier's vinyl resin coating has proved to be of great utility and has gained great commercial success. In respect of utility, it was testified that: Work had been done on the problem of discovering a satisfactory material for lining metal cans and metal foil as food containers for nine or ten years prior to the work of Frazier, and nothing had been discovered suitable for either foil for food such as cheese or containers for beverages. Apparently every known coating material had been tried for use on tin foil before vinyl resins were used, and none had been found satisfactory. Frazier's material answered the problem. Vinyl resins have been found satisfactory upon cheese wrappers, capsules for butter coloring, caps for jars containing food products such as mayonnaise, caps for petrolagar jars, and upon linings for beer and wine cans. As many as twenty-five or thirty different brands of cheese, including a number of the well known popular brands, are packaged in vinyl resin coated foil known as Vinylite. Indeed the vinyl resin coating is apparently suitable for the packaging of almost any kind of food. In respect of commercial success it was made to appear from the testimony that: Commercial use of vinyl resins for packaging food products was extensive before advertising of their availability occurred, and this notwithstanding that their use increased the expense of packaging. The American Can Company, the Hazel-Atlas Glass Company, and the Aluminum Company of America are large users of vinyl resins for food packaging purposes. In 1936 about three and one-half million pounds of vinyl resins were sold and about two-thirds of this amount went into protective coatings, including coatings for metal foil and the lining of cans. Counsel for the Commissioner conceded that Vinylite lining has gone into commercial use on cans.

The Commissioner contends, however, that Frazier's application discloses no invention. His argument is that it was old to enclose food in wrappers such as tin foil coated with paraffin, or tin foil sealed with paraffin, or tin foil covered with shellac; and he asserts that a vinyl resin had been used as the coating of a gelatine base for a food wrapper, and that the characteristics of vinyl resins were known prior to Frazier. Thus the Commissioner contends that Frazier has done nothing more than substitute a material in a coated food container or wrapper and that the prior art and the known characteristics of the material made the substitution obvious.

The references cited in the Patent Office and relied upon in the trial court and by the Commissioner on this appeal are: Howell, No. 1,057,552, April 1, 1913; Klatte et al., No. 1,241,738, Oct. 2, 1917; Beatty, No. 1,369,159, Feb. 22, 1921; Conomos, No. 1,529,170, March 10, 1925; Humpert, No. 1,765,920, June 24, 1930; Young et al., No. 1,775,882, Sept. 16, 1930; and Kratz, No. 1,837,555, Dec. 22, 1931.

We think it unnecessary to discuss in any detail either Beatty or Conomos, for each of these references is in our view irrelevant. Beatty discloses merely a method of packaging chewing gum, candy or the like in tin foil sealed with paraffin. Conomos describes the packaging of confectionery, tobacco products, dairy products, and the like in a wrapping sheet coated with animal jelly. Conomos is not mentioned in the brief of the Commissioner and Beatty is not emphasized.

Humpert's invention is the coating of tin foil with resin so as to produce a food wrapper capable of resisting organic acids and metallic sulphides. The resin used is shellac, a natural resin, as distinguished from a synthetic resin.[2] The witness Doolittle testified that such a coating material would not be successful for packaging food products in metallic containers for the reason that shellac is brittle and, therefore, would not stand up under the continuous flexing that a foil wrapper must undergo but would crack, and hence no longer protect the food; he also stated that a shellac coating would be quite unsuitable for cans containing liquids because shellac is penetrable by water.

Howell's invention is a food product wrapper made of tin foil coated on the food

---

2 See T. Hedley Barry, Natural Varnish Resins (1932).

side with paraffin wax. It is intended to prevent contact of the food with the air, and also to prevent contaminating contact between the food and the foil. In the opinion of Doolittle this invention would not accomplish what was claimed for it, for the reason that paraffin is brittle at low temperatures and non-adherent and, therefore, would not be sufficiently permanent as a foil coating, and also could not be flexed without cracking, which would expose the metal; moreover it would be attacked by oils in cheese, which are solvents for wax.

The Klatte patent discloses the process of obtaining vinyl resins from vinyl esters by polymerization, explaining that polymerization may be effected by light or heat, or by light and heat combined, and that it can be accelerated by the use of various catalysts.[3] The specification states that the properties of vinyl resins obtained through the polymerization process will vary more or less with the catalyst used. Among the products disclosed by Klatte is an odorless, fireproof film which may be used for coating, lacquering and painting or impregnating various substances such as wood, paper, textile fabric and artificial stone with the effect of imparting high resistance to the action of water, acids, alkalis, and atmospheric changes. There is no mention of the use of the film for the preservation of foodstuffs. And Doolittle pointed out that there is no disclosure of the use of the film with metals.

The Young invention is a method of polymerization of vinyl compounds in the presence of tetraethyl lead as a catalyst. Young explains that films containing vinyl resins otherwise prepared had been found to exhibit an objectionable tendency to disintegrate upon long exposure and to darken when heated, these tendencies being especially pronounced when the films were in contact with metal. He states that it had been assumed that corrosion of the underlying metal by acid developed in the resin was in some measure responsible for the film deterioration, and he points out that films containing resins prepared with tetraethyl lead are more stable in contact with metals. In respect of this invention Doolittle said that it points away from the use of vinyl resins for food packaging because it discloses their inapplicability to use with metal except when prepared in the presence of tetraethyl lead, which is a poison.

The Kratz patent consists of coating a gelatine sheet with a vinyl resin in order to make it more resistant to moisture. The result described is a thin, transparent sheet, substantially moisture proof, and especially adapted for use in the wrapping of candy, bonbons, food, and other perishable material. Doolittle said concerning this invention that it would not be operative in respect of beer cans because gelatine would not adhere to metal, or, if it did, would swell and come off the walls of the container. He pointed out also that Kratz does not refer to the use of vinyl resins on metals, or to metallic food packages.

Summarizing, the prior art teaches the use of tin foil as a food wrapper, and the attempt to use films, such as shellac and paraffin, as a coating. It teaches the use of a vinyl resin film as a lacquer or paint upon wood, paper, textiles and artificial stone. It teaches also the use of a vinyl resin film on a gelatine sheet wrapper. It teaches also the making and the general properties of vinyl resins, that is, that they are resistant to water, acids, alkalis and atmospheric changes. But the art does not teach the use of vinyl resins in contact with metal. In this respect its teaching is not only negative but contrary, for in the only instance in which the use of a vinyl resin film is mentioned in contact with metal it is disclosed that the film disintegrates unless made with tetraethyl lead, a poison. The art had not answered the need in food packaging of a coating for metal packaging material which would protect foodstuffs from exterior contamination, be itself resistant to chemical action of the foodstuffs, and which would itself impart no odor or taste thereto.

Frazier has for the first time successfully used a vinyl resin film in contact with metal as a food container. The question in the case is, therefore, simply whether this substitution of a material whose general properties are known is invention.

■■■ We reviewed and stated the law in respect of substitution of parts in a machine or of materials in a manufacture as invention in Gasoline Products Co. v. Coe, 66 App.D.C. 333, 87 F.2d 550, 1936, and we there cited the leading cases on the subject. The upshot of the decisions of course is that there must have been inventive capacity as distinguished from mechanical or routine skill necessary to accomplish the substitution. If from the prior art or from the properties of the thing substituted, the

---

[3] A catalyst is a chemical action accelerator.

substitution was obvious, no patent is allowable. If, on the contrary, it was not obvious, if inventive capacity was required to see the applicability to the use in question of the thing substituted, and the advantage in new and useful results or increase in efficiency or saving in operation, then a patent is to be granted. In terms of a quotation from Low v. McMaster, 266 F. 518, 519, 520, 3 Cir., 1920, the law has been well epitomized thus:

" 'On this subject it is the law, that merely to substitute superior for inferior materials, in making one or more or all of the parts of a machine or manufacture, is not invention, although the substitution may be of materials that are both new and useful in high degree. It is also the law, as exceptions to this general rule, that if the substitution involved a new mode of construction; or if it developed new properties and uses of the article made; or where it produces a new mode of operation, or results in a new function; or when it is the first practical success in the art in which the substitution is made; or where the practice shows its superiority to consist not only in greater cheapness and greater utility, but also in more efficient action, it may amount to invention.' " [66 App.D.C. at page 340, 87 F.2d at page 557.]

■■ Since a vinyl resin film had never, *prior* to Frazier, been *successfully* used against metal except when prepared in the presence of a poison, tetraethyl lead, as a catalyst, it at least cannot be said to be clear that Frazier's substitution was obvious. And if obviousness is doubtful, the doubt may be resolved by the satisfaction of a need which the art, long knowing, has failed to satisfy. "That its [the substituted material] selection was not an obvious thing is persuasively and cogently shown by the fact that during many years numerous inventors were trying to remedy the defects in the old device, and it did not occur to them how simply and satisfactorily this could be done by making the button of rubber or some other elastic or yielding material. * * * When the substitution has accomplished a result which those skilled in the art had long and vainly sought to effect, the evidence that it involved something beyond the skill of the calling is so persuasive that it generally resolves the inquiry in favor of patentable novelty." George Frost Co. v. Cohn, 119 F. 505, 507, 508, 2 Cir., 1902. Again, "Where the method or device satisfies an old and recog-

nized want, invention is to be inferred, rather than the exercise of mechanical skill. For mere skill of the art would normally have been called into action by the generally known want." Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 474, 55 S.Ct. 449, 79 L.Ed. 997, 1935. See also United Shoe Machinery Corp. v. E. H. Ferree Co., 64 F.2d 101, 103, 2 Cir., 1933, where the court said: "One of the safe tests of patentability is to inquire as to the condition of the art and the call for improvement."

■ Under a further well recognized rule, the utility of a substitution is an important factor in determining its patentability. Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 495, 23 L.Ed. 952, 1876; and see Textile Machine Works v. Hirsch Textile Machines, 302 U.S. 490, 498, 58 S.Ct. 291, 82 L.Ed. 382, 1938; Re Harbeck, 39 App.D.C. 555, 561, 562, 1913.

■ It is equally well settled that commercial success is strong evidence of utility and patentability. Walker on Patents (6th ed., 1929) § 126. In Yablick v. Protecto Safety Appliance Corp., 21 F.2d 885, 887, 3 Cir., 1927, it was stated that the fact that a process comes immediately into general use and replaces all other like processes is persuasive of invention. This was said upon the faith of Minerals Separation, Ltd. v. Hyde, 242 U.S. 261, 270, 37 S.Ct. 82, 61 L. Ed. 286, 1916, where it was held that the fact that a process was "immediately generally accepted as so great an advance over any process known before that, without puffing or other business exploitation, it promptly came into extensive use . . . and .. . . largely replaced all earlier processes . . . of itself is persuasive evidence of that invention which it is the purpose of the patent laws to reward and protect."

■ The substitution in the instant case accomplished within Low v. McMaster more efficient action and the first practical success in the art in which the substitution was made. Within George Frost Co. v. Cohn, Paramount Publix Corp. v. American Tri-Ergon Corp. and United Shoe Machinery Corp. v. E. H. Ferree Co., doubt, if any there be, that the substitution was obvious must be resolved in favor of Frazier. He succeeded in satisfying, where the prior art had failed, a recognized need of some ten years standing. In respect of utility, the evidence in the instant case is such that the rule of Smith v. Goodyear

Dental Vulcanite Co. and Re Harbeck necessarily operates in Frazier's favor. It was amply established that a high degree of utility was reached in his substitution of vinyl resins as a coating for metal food packaging materials. And finally Frazier is entitled to the benefit of the rulings of Yablick v. Protecto Safety Appliance Corp. and Minerals Separation, Ltd. v. Hyde in respect of commercial success. Commercial success to an extraordinary extent was established in the instant case; indeed, was conceded by the Commissioner.

Proceeding from the application of elementary rules to the analogy of similar cases, Frazier is entitled to a patent under Gasoline Products Co. v. Coe, where we recognized as patentable the substitution of a chromium alloy in the tubes of a heating coil for cracking hydro-carbon oils. The properties of chromium to resist corrosion generally were known, but the applicant was the first to discover its resistance to sulphur corrosion and to substitute it. And under the leading cases which we reviewed in Gasoline Products Co. v. Coe on the subject of substitution, Frazier is equally entitled to a patent: United Shoe Machinery Corp. v. E. H. Ferree Co. (substitution of aluminum for cast iron in the hammer arm of a clicking machine used in cutting shoe uppers); Re Harbeck (substitution of fused cement for a soluble adhesive for holding together the layers of paper vessels); Yablick v. Protecto Safety Appliance Corp. (substitution of copper sulphate for sulphuric acid and pumice in gas masks for the absorption of ammonia from ammonia saturated air); George Frost Co. v. Cohn (substitution of rubber for metal in a hose supporter button); and Low v. Mc-Master (substitution of a solid for a liquid fuel in a vulcanizing apparatus). In each of these cases the general properties of the material substituted were known, but the use of the material in the particular machine or product had long been overlooked and the substitution resulted in satisfying a substantial need in the art with a high degree of utility and commercial success.

Thus both within the elementary rules above stated and by analogy to the leading cases on substitution, the Frazier application should have been recognized as entitled to a patent. The decisions to the contrary in the Patent Office and the trial court were in our view clearly erroneous. Accordingly the decree is

Reversed and the case remanded for further proceedings in accordance with this opinion.

EDGERTON, Associate Justice (dissenting).

I think there was no invention here; and I think weight should be given to the presumption of administrative correctness.

As the court states, among the uses of vinyl resin disclosed by Klatte is "an odorless, fireproof film which may be used for coating * * * various substances such as wood, paper, textile fabric and artificial stone with the effect of imparting high resistance to the action of water, acids, alkalis and atmospheric changes;" and Kratz had applied a vinyl resin film to gelatine to produce "a thin, transparent sheet, substantially moisture proof, and especially adapted for use in the wrapping of candy, bonbons, food and other perishable material." The Young application shows that films containing vinyl resins (and no tetraethyl lead) had been applied to metals.[1] Before Frazier, then, films of vinyl resin were known to be thin, transparent, odorless, moisture proof, fireproof, and highly resistant to acids, alkalis, and atmospheric changes; they had been applied to a great variety of substances, including metals; and they had been used for coating certain non-metallic food containers. Frazier's application of these same films to metallic food containers was new, and useful in the extreme; but in the light of the prior art I think it was not invention.

An invention, as Judge Learned Hand has said, is "a new display of ingenuity beyond the compass of the routineer;" the line is between "what seems an easy step and what does not." Kirsch Manufacturing Company v. Gould Mersereau Company, Inc., 2 Cir., 6 F.2d 793, 794. Unless "some uncommon talent" is displayed, there is no invention, whatever the utility and success of the device. Textile Machine Works v.

---

[1] Since the lining of many food packages is subjected neither to heating nor to long exposure, Young's erroneous assertion that such films, when used on metals, tended to disintegrate on long exposure and to darken when heated conveyed, in my opinion, no broadly adverse suggestion with respect to the use of the combination of vinyl resin and metal for food-packing purposes. However that may be, the fact remains that the combination, metal with a vinyl resin coating, was known.

Louis Hirsch Textile Machines, Inc., 302 U.S. 490, 499, 58 S.Ct. 291, 82 L.Ed. 382, 1938. Substituting, in the Supreme Court's language in the Textile Machine Case, our facts for those with which the Court was dealing: "Commercial success may be decisive where invention is in doubt, but an insuperable obstacle to the invocation of that doctrine here is our inability, like that of the court below, to say 'that an art which knew'" the use of metal food containers, and also the use of vinyl ester coatings for food containers, "'required some uncommon talent merely to conceive of combining the two'" (302 U.S. 490, 498, 499, 58 S.Ct. 291, 294, 82 L.Ed. 382): the more so as vinyl ester coatings had already been applied to metals for some purposes.

The prevailing opinion herein does not question the rule that "it is only when invention is in doubt that advance in the art may be thrown in the scale." Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 474, 55 S.Ct. 449, 453, 79 L. Ed. 997. Impliedly recognizing that rule, the opinion observes that "if obviousness is doubtful, the doubt may be resolved by the satisfaction of a need which the art, long knowing, has failed to satisfy." But decisions and dicta that, when invention is in doubt, long felt want and commercial success "may be thrown in the scale" and may be sufficient to turn it, in my judgment mean just that. They mean that need and success are then entitled to some weight as evidence; not that they are entitled to conclusive weight. The question still is, was there invention? It would be arbitrary to hold that every degree, including the greatest, of doubt concerning invention must be resolved in every case by any showing of need and success. Moreover, with the exception of cases decided in this court, the decisions and dicta cited on this point in the prevailing opinion occur in infringement cases. There, the question was whether the Patent Office was right in granting a patent, and for that reason the presumption was in favor of invention. Here, the question is whether the Office was right in refusing a patent; the presumption therefore is against invention. It is two long steps from the proposition that certain evidence justifies a court in sustaining the Patent Office to the proposition that like evidence requires a court to overrule the Patent Office. If the latter proposition is adopted,

need and success, instead of having mere evidential or persuasive value, are made conclusive; and they are used to overcome, instead of support, the usual presumption of administrative correctness.

The prevailing opinion does not assert that need and success are conclusive in all cases; but it argues that they are conclusive in this case. If, as that opinion conceives, the other evidence leaves invention in doubt, I think the evidence of need and success should not overcome the presumption of administrative correctness. If that presumption were applied, and if more than a formal deference were paid to it, it would, I think, preclude the result which the prevailing opinion reaches.[2] I think the presumption should be applied.

Speaking for a unanimous Court, Justice Cardozo said: "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 287, 54 S.Ct. 692, 694, 78 L. Ed. 1260. "It has long been settled that determinations of fact for ordinary administrative purposes are not subject to review." Phillips v. Commissioner of Internal Revenue, 283 U.S. 589, 600, 51 S.Ct. 608, 612, 75 L.Ed. 1289. Accordingly, "it might well be argued, were it not for the terms of this statute [R.S. § 4915, 35 U.S. C.A. § 63], that the decision of the patent office was a finality upon every matter of fact." Morgan v. Daniels, 153 U.S. 120, 124, 14 S.Ct. 772, 773, 38 L.Ed. 657. Though it is not a finality, the Patent Office decision is entitled to great weight.

"A patent regularly issued * * * is presumed to be valid until the presumption has been overcome by convincing evidence of error." One who assails its validity "bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance." Radio Corporation of America et al. v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7, 8, 55 S.Ct. 928, 931, 79 L.Ed. 163. This presumption applies regardless of the nature of the attack upon the patent. It covers, e. g., the issue of patentable novelty (Smith, Executor v. Hall, 301 U.S. 216, 233, 57 S.Ct. 711, 81 L.Ed. 1049) or invention. Gulf Smokeless Coal Company v. Sutton, Steele & Steele, 4 Cir., 35 F.2d 433, certiorari denied 280 U.S. 609, 50 S.Ct. 158, 74 L.Ed. 652.

---

2 Cf. Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 73, 54 S.Ct. 315, 78 L.Ed. 655.

The Patent Office is no more likely to err when it rejects an application for a patent than when it grants one. Accordingly it has become established in various courts and in various contexts that the action of the Office in rejecting an application is likewise supported by a strong presumption, and not to be upset unless it is shown to be clearly wrong. The Court of Customs and Patent Appeals, which now has jurisdiction of appeals from the Patent Office, holds that when "two tribunals of the Patent Office have concurred in holding that the claims * * * lack invention" and the art is a technical one, "the decision of the Board of Appeals should be affirmed unless manifestly wrong." In re Alden, Cust. & Pat.App., 65 F.2d 136, 137. Cf. In re Pirani, Cust. & Pat.App., 75 F.2d 223. Similarly this court, when it served as the appellate tribunal for the Patent Office, held in Re Beswick's Appeal, 16 App.D.C. 345, 350, that:

"Where patentable novelty has been denied by all of the expert tribunals of the Patent Office, it is incumbent upon one appealing therefrom to make out a clear case of error in order to obtain a reversal. * * * That rule is particularly applicable to this case, which, for its satisfactory determination, requires technical knowledge of an abstruse art that can only be acquired through thorough training."

Oldroyd v. Morgan, 58 App.D.C. 78, 24 F.2d 1004, is an interference case in which this court, on appeal from the Patent Office, applied the same rule.[3] A suit like the present one, under § 4915, differs from an appeal from the Commissioner's decision in that in these suits and not in those new evidence, in addition to the Patent Office record, may be introduced in court. This increases the provability, but not the probability, of error on the part of the Office. Accordingly it is at least as appropriate in these suits as in those to sustain the Office unless it be shown that it was clearly wrong.

If the applications of A and B are considered by the Patent Office in interference proceedings, with the result that priority is awarded to B, A's suit under § 4915 for a patent is brought against B. In such suits it is well settled that grant and rejection alike are accepted by the courts as correct unless they are shown to be clearly wrong. Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657; cf. Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L. Ed. 163; Bayer v. Rice, 64 App.D.C. 107, 75 F.2d 238; Gold v. Gold, 7 Cir., 237 F. 84; Larson v. Crowther, 8 Cir., 26 F.2d 780, certiorari denied 278 U.S. 648, 49 S.Ct. 83, 73 L.Ed. 560; Dowling v. Jones, 2 Cir., 67 F.2d 537; Syracuse Washing Machine Corporation v. Vieau, 2 Cir., 72 F.2d 410, certiorari denied 294 U.S. 717, 55 S.Ct. 544, 79 L.Ed. 1250. In Morgan v. Daniels, supra, the Court said:

"* * * This is something more than a mere appeal. It is an application to the court to set aside the action of one of the executive departments of the government. * * * It is something in the nature of a suit to set aside a judgment, and, as such, is not to be sustained by a mere preponderance of evidence." 153 U.S. 120, 124, 14 S.Ct. 772, 773, 38 L.Ed. 657.

As Judge Learned Hand put it in the Dowling Case, "the findings of the Patent Office must prevail unless we cannot avoid an opposite conclusion." 67 F.2d 537, 538.

If, as in the present case, an application is rejected by the Patent Office without being considered in interference proceedings, suit under § 4915 for a patent is brought against the Commissioner of Patents. Neither the statute nor the nature of the case suggests a distinction, in respect to presumptions, between the two suits under § 4915, and I think that Morgan v. Daniels, supra, applies. The point has seldom been considered, but there is express authority for applying here the normal principle that the Patent Office decision stands unless it is shown to be clearly wrong. Robertson, Commissioner of Patents v. Cooper, 4 Cir., 46 F.2d 766, like this case, was a suit under § 4915 against the Commissioner of Patents. The patent authorities had ruled that an application for a design patent lacked invention. The Court of Appeals for the Fourth Circuit, in the face of a contrary decision by the District Court, sustained the patent authorities. It said:

"* * * While the judgment of Patent Office officials is not absolutely binding

---

[3] A line of cases like In re Coykendall, 58 App.D.C. 280, 29 F.2d 868, hold that doubt as to the validity of rejected claims should be resolved, on appeal, in favor of the applicant. These cases are contrary not only to those just cited but to the whole current of authority. In effect they presume that (1) the Patent Office is wrong and (2) one who demands a legal monopoly is entitled to it.

on the courts, it is entitled to great weight, and is to be overcome by clear proof of mistake." 46 F.2d 766, 768.[4]

Likewise in Austin v. Coe, 63 App.D.C. 94, 69 F.2d 832, the Commissioner of Patents had rejected plaintiff's claim without considering it in interference proceedings,[5] plaintiff's suit under § 4915 was brought against the Commissioner, and this court applied the presumption that the Patent Office was right.

Suits brought under § 4915 by the loser against the winner of Patent Office interference proceedings have usually turned, like Morgan v. Daniels, supra, on priority of invention or reduction to practice—questions of pure fact. But, as has been shown, the presumption that the Patent Office is right has been repeatedly applied, in other contexts, to the question of invention. Patentable invention is sometimes called a question of fact,[6] sometimes a question of mixed fact and law, and sometimes a "conclusion of law;" since the answer depends partly on matters of pure fact with regard to the prior art, etc., and partly on measuring such facts against the concept of invention. But there is nothing about invention which should exempt it from the general rule that the Patent Office is presumed to be right. Many questions which our law treats as fact involve the measuring of data against concepts, and leave room for differences of opinion in the process. Findings on negligence, e. g., involve determining what happened and the circumstances in which it happened, and then measuring these results against the concept of due care.[7] The rule that the Patent Office should be sustained unless it is clearly wrong is peculiarly appropriate to the question of invention. That question "must be resolved by a subjective opinion as to what seems an easy step and what does not."[8] Usually, as in the present case, a distinct science or technical specialty is involved; and in distinguishing easy steps from others, expertness in the special field is, to put it mildly, a great advantage. "The Patent Office has the equipment for deciding intricate and technical questions of this character." Robertson, Commissioner of Patents v. Cooper, supra.[9] In applying the rule to a similarly technical question, the construction and scope of patent claims, Judge Mack said:

"* * * it is just such questions that the administrative tribunal is pre-eminently qualified to solve. Even then, of course, the court is not absolved from the duty of examination; but, unless it be perfectly clear that the final expert administrative body * * * erred, relief should not be granted under section 4915." Gold v. Gold, 7 Cir., 237 F. 84, 86.

In spite of the presumption the Supreme Court has frequently overturned, for lack of invention and other reasons, the decision of the Patent Office that a claim was patentable.[10] In so doing it has protected the

[4] The Court of Appeals of the District of Columbia at the time had supervisory jurisdiction in the administration of the patent laws (Butterworth v. Hoe, 112 U. S. 50, 60, 5 S.Ct. 25, 28 L.Ed. 656; Postum Cereal Company v. California Fig Nut Company, 272 U.S. 693, 47 S. Ct. 284, 71 L.Ed. 478), and had affirmed the decision of the Commissioner of Patents. This circumstance did not affect the decision of the Circuit Court of Appeals. The same is true of Gold v. Gold, supra.

[5] Plaintiff had tardily and unsuccessfully sought to have his claim included in certain interference proceedings which were pending in the Patent Office. The question discussed by the court was whether the refusal of the Office to include it was a correct application of the Office rules.

[6] The question is "admittedly one of fact," although it gives rise to "acute differences of opinion as to the inferences to be drawn from facts in themselves uncontradicted" and "may 'be answered differently by persons of equal intelligence.'" Kurtz v. Belle Hat Lining Co., Inc., 2 Cir., 280 F. 277, 279, 280, 281.

[7] The issue of invention "necessarily depends upon a shifting standard, just as in cases of due care." L. Hand, J., in Kirsch Mfg. Company v. Gould Mersereau Company, Inc., 2 Cir., 6 F.2d 793, 794.

[8] Kirsch Manufacturing Company v. Gould Mersereau Company, Inc., 2 Cir., 6 F.2d 793, 794.

[9] Cf. Lucke v. Coe, 63 App.D.C. 61, 64, 69 F.2d 379.

[10] Recent decisions of the Supreme Court, considered as a group, indicate that the Patent Office tends to be too liberal rather than too strict in granting patents. Since the summer of 1933 the Court has written opinions in some eighteen infringement suits in which it considered the validity of patents. In six cases, five patents were upheld. Radio Corp. of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163, priority of invention;

public against a legal monopoly which the owner of the invalid patent was attempting to assert. Where, as in the present case, the Patent Office has decided that a claim is not patentable, to overturn its decision has exactly the opposite effect; it results in subjecting the public to a legal monopoly. It follows, in my judgment, that courts should be even less ready to reverse the Patent Office in proceedings of the present type than in infringement proceedings.

In Morgan v. Daniels, supra, the Supreme Court relied on the presumption to the point of reversing the Circuit Court which, in a suit under § 4915, had reversed the Patent Office on a question of priority. In the Robertson case the Fourth Circuit relied on it in reversing the District Court, which had reversed the patent authorities on a question of invention. In the Morgan case the court said:

"The variety of opinion expressed by the different officers who have examined this testimony is persuasive that the question of priority is doubtful, and, if doubtful,

the decision of the patent office must control." 153 U.S. 120, 125, 14 S.Ct. 772, 773, 38 L.Ed. 657.

If variety of opinion between the Patent Office and the trial court leaves it doubtful whether the Patent Office is wrong, unanimity of opinion between the Patent Office and the trial court makes it far more doubtful whether the Patent Office is wrong. That is the situation here. The presumption that the Patent Office is right is reenforced by the presumption that the trial court is right.

"There is always a presumption in favor of that which has once been decided, and that presumption is often relied upon to justify an appellate court in sustaining the decision below." 153 U.S. 120, 123, 124, 14 S.Ct. 772, 773, 38 L.Ed. 657.

"Under the rule settled in this jurisdiction, while we are not absolutely bound by a chancellor's findings of fact, we are not to disturb them on appeal unless upon an examination of the evidence they are clearly wrong."[11] The situation is closely

---

Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721, and Waxham v. Smith, 294 U.S. 20, 55 S.Ct. 277, 79 L.Ed. 733 (a single patent, later held invalid in Smith v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049), invention; Bassick Co. v. Hollingshead Co., 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251, invention; Crown Cork & Seal Co. v. Ferdinand Gutmann Co., 304 U.S. 159, 58 S.Ct. 842, 82 L.Ed. 1265, timeliness of application; General Talking Pictures Corp. v. Western Electric Co., 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273, affirmed on rehearing Nov. 21, 1938, 59 S.Ct. 116, 83 L.Ed. —, timeliness of application. Also, in United States v. Esnault-Pelterie, 303 U. S. 26, 58 S.Ct. 412, 82 L.Ed. 625, the decision of the Court of Claims in favor of validity was accepted as conclusive.

In twelve cases, fourteen patents were held invalid. Electric Cable Co. v. Edison Co., 292 U.S. 69, 54 S.Ct. 586, 78 L.Ed. 1131, lack of invention; Keystone Co. v. Northwest Eng. Corp., 294 U.S. 42, 55 S.Ct. 262, 79 L.Ed. 747 (two patents), lack of novelty, and lack of invention; Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997, lack of invention; Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005, lack of invention; Stelos Co. v. Hosiery Motor-Mend Corp., 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414, lack of invention; Essex Razor Blade Corp. v. Gillette Safety Razor Co., 299 U.S. 94, 57 S.Ct. 68,

81 L.Ed. 60, lack of invention; Smith, Executor, v. Hall, 301 U.S. 216, 57 S. Ct. 711, 81 L.Ed. 1049 (holding invalid patent formerly upheld in Smith v. Snow and Waxham v. Smith), prior use; Mantle Lamp Co. v. Aluminum Products Co., 301 U.S. 544, 57 S.Ct. 837, 81 L.Ed. 1277, lack of invention; Textile Machine Works v. Hirsch Textile Machines, 302 U.S. 490, 58 S.Ct. 291, 82 L.Ed. 382, lack of invention; Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008, claim too broad; General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S. Ct. 899, 82 L.Ed. 1402, insufficient disclosure, etc.; Schriber-Schroth Co. v. Cleveland Trust Co., 59 S.Ct. 8, 83 L. Ed. — (Nov. 7, 1938; two patents), insufficient disclosure.

Where the issue was strictly that of invention, as the foregoing lists show, two patents (including one later invalidated) were held valid and eight invalid.

During the same period the Court wrote opinions in some ten patent suits in which it did not pass upon the validity of the patent.

[11] Hazen v. Hawley, 66 App.D.C. 266, 271, 86 F.2d 217, certiorari denied 299 U.S. 613, 57 S.Ct. 315, 81 L.Ed. 452. The question there, whether a zoning regulation was arbitrary and therefore unconstitutional, involves as large an element of opinion, in the measuring of facts against a concept, as the question whether a patent claim discloses invention.

247

analogous to that in which the Supreme Court has said: "The two courts below are in agreement as to the inferences fairly to be gathered from the facts, and their findings are not to be disturbed unless clearly erroneous." United States v. Commercial Credit Company, Inc., 286 U.S. 63, 67, 52 S. Ct. 467, 468, 76 L.Ed. 978.

I think the decree dismissing appellant's bill should be affirmed.