38 C.C.P.A. (Patents)
### Application of PAPPAS et al.
### No. 5744.

United States Court of Customs and Patent Appeals.

Dec. 5, 1950.

Charles S. Wilson, Chicago, Ill. (Eugene H. Purdy, Washington, D. C., of counsel), for appellants.

E. L. Reynolds, Washington, D. C. (Clarence W. Moore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the rejection by the Primary Examiner, hereinafter referred to simply as the examiner, of the claims embraced in appellants' application for patent relating, according to the specification, "to airfoils and especially to an airfoil for airplanes characterized by a section or profile which gives greatly increased efficiency at high speeds." In Webster's New International Dictionary "airfoil" is defined as "Any surface, flat or curved, as a wing, aileron, or rudder, designed to obtain reaction upon its surfaces from the air through which it moves."*

---

* The brief on behalf of appellants supplies a list of words used in their application and in the prior art, giving definitions of them "as generally accepted in aerodynamics," which we here reproduce as an aid in understanding the claimed invention and the prior art.

Airfoil: is any surface or aircraft component, such as an airplane wing, aileron, rudder, or elevator designed and intended to react with the air through which it moves.

Wing: is a general term applied to an airfoil designed to develop the major part of the lift for the airplane and thereby sustain it in flight.

No claims were held allowable.

When passed upon by the examiner in his final decision, eight claims—numbered 8 to 14, inclusive, and 19—were involved. All were rejected by him and all were embraced in the appeal to the board, whose decision sustained the conclusion of the examiner.

Claims 8 and 11 were not included in the

| | |
|---|---|
| Profile: | is a transverse section through an airfoil and illustrates its configuration, shape or contour. |
| Leading Edge: | is the foremost or forward edge of an airfoil with reference to its direction of movement through the air, i. e., the edge thereof first penetrating and dividing the air for flow over the airfoil surfaces. While a profile literally does not have edges, that portion of the profile coinciding with the leading edge of the airfoil is universally designated as the leading edge. |
| Trailing Edge: | is the rearmost or aft edge of an airfoil with reference to the direction of movement through the air. While an airfoil literally does not have edges, that portion of the profile coinciding with the trailing edge of the airfoil is universally designated the trailing edge. |
| Chord: | is an arbitrary datum line from and by which the ordinates and angles of an airfoil are measured. It is the shortest distance between the leading and trailing edges of the profile and is represented by a straight line between these points. |
| Camber: | is the rise of the curve of the profile of an airfoil from the chord and is usually expressed as the ratio of the amount of departure of this curve from the chord of the profile to the length of the chord. |
| Maximum Thickness: | is just what the term implies, viz., the greatest thickness of the profile measured on a line normal to the chord and is usually expressed as a percentage of the chord length. |
| Thickness Ratio: | is primarily the ratio of the maximum thickness of the profile of an airfoil to the length of the chord, and is also used to denote the ratio of the thickness of the profile at any point along the chord to the chord length. |
| Angle of Attack: | is the angle between the chord of the profile of an airfoil and the wind direction relative to the airfoil, or the angle between the chord and the path of movement of the center of gravity of the airplane, both of these angles being the same. |
| Drag: | is the total resistance of the airfoil to the flow of air over its surfaces. |
| Mach Number: | is the ratio of the velocity of an airfoil in flight to the speed of sound. |
| Reynolds Number: | is a parameter or constant being a nondimensional coefficient used as a measure of the dynamic similarity of airflows. It is mathematically expressed as: |

$$RN = \frac{u\,V\,L}{p}$$

where RN is Reynolds Number, u (mu) the viscosity of the air, V the velocity of the airfoil through the air, L is the chord length of the profile and p (rho) is the density of the air.

However, once the airfoil and its profile is designed and determined its RN may be calculated. Since all airfoils with the same RN behave similarly with respect to air flow, a scale model of an airfoil therefore will perform in a wind tunnel the same as a full size airfoil with the same RN in flight.

appeal, to us, and in the brief filed for appellants before us it was requested that the appeal be dismissed as to claim 9. At the oral hearing before us its dismissal was moved by counsel for appellants, and the dismissal so sought is formally granted in the concluding portion of this decision.

So, there are involved before us only claims 10, 12, 13, 14, and 19.

These read as follows:

"10. An airfoil section derived from a basic thickness distribution contour having a chord, an elliptical forebody the longitudinal axis of which coincides with said chord and the transverse axis of which is normal to the chord at a point situated aft from the leading edge approximately forty per cent (40%) of the length of the chord, and an afterbody convergent aft from the ends of said transverse axis.

"12. An airfoil section having a high limiting Mach number wherein its forward portion is a substantial ellipse with its major axis cambered with respect to the chord of the airfoil and extending aft from the leading edge a distance approximately equalling sixty-five per cent (65%) of the length of said chord, and its aftward portion is tangential to the aft end of the forward portion and convergent to develop a relatively sharp trailing edge.

"13. An airfoil section having a high limiting Mach number wherein its forward portion is a substantial ellipse with its major axis extending aft from the leading edge a distance approximately equalling sixty-five per cent (65%) of the length of the chord and having a maximum thickness of about eighteen per cent (18%) of the length of the chord at a point situated aft from the leading edge a distance equal to approximately forty per cent (40%) of the length of the chord, and its aftward portion tapers aft from the forward portion to a sharp trailing edge.

"14. An airfoil section derived from a basic thickness distribution contour having a substantially elliptical portion extending aft from the leading edge approximately sixty-five per cent (65%) of the length

of its chord, a maximum thickness of about eighteen per cent (18%) of the length of its chord in a plane normal to the chord situated aft of the leading edge approximately forty per cent (40%) of the length of the chord, and a generally wedge shaped aft portion having its upper and lower surfaces tangential to the aft end of the elliptical portion.

"19. An airfoil section derived from a basic thickness contour having a symmetrical, elliptical forebody extending aft from the leading edge approximately 65% of the length of the chord, a maximum thickness of not more than 18% of the length of the chord situated aft of the leading edge about 40% of the length of the chord, and an afterbody extending over substantially 35% of the chord having its forward end tangential to the aft end of the forebody and its upper and lower surfaces generally converging to a relatively sharp trailing edge."

In its decision the board criticized the form of the claims with some vigor, and the brief on behalf of appellants before us responds to the criticism with even greater vigor, but it is noted that after its criticism the board said: " * * * Since the Primary Examiner has not raised any questions as to the form of the claims, however, we will consider them in the manner the Primary Examiner seemed to have understood as intended by applicants instead of as they appear."

In view of that statement, any question which might have existed as to the form of the claims, in our opinion, became moot so far as this proceeding is concerned. No reference is made to it in the Reasons of Appeal, and we do not feel that it is incumbent upon this court to attempt to settle any issue respecting the form of the claims.

It was the view of the examiner that the differences between the claims and the disclosures of the prior art constituted "merely an adjustment of proportion and a change in degree rather than a change in kind." This view was sustained by the board, which seems to have been of opinion that

at least some of the features of the prior art are anticipatory of the claims. Hence, the brief for appellants asserts:

" * * * The instant appeal therefore involves two primary points relating to the merits of claims 10, 12, 13, 14 and 19, to wit:

"A. That the manifest and conceded differences between the Appellants' airfoil and the disclosures of the prior art amount to invention in that they are differences in kind rather than a matter of degree; and

"B. That claims 10, 12, 13, 14 and 19 are patentable over the references cited and relied on by the Patent Office.

"The first point is essentially a question of invention, while the second is one of anticipation and it is contended that the Board of Appeals erred in deciding both."

The references listed in the statement of the examiner following the appeal to the board, as being relied on, consist of the following patents:

| | | | |
|---|---|---|---|
| Stalker, | 2,041,792, | May 26, | 1936, |
| Mitsubishi (Fr.) | 643,308, | Sept. 14, | 1928, |
| Herrick (Br.) | 375,327, | June 14, | 1932, |
| Taylor, et al. (Br.) | 525,666, | Sept. 2, | 1940, |
| Ludington, et al. | 2,408,788, | Oct. 8, | 1946, |
| Klemm, | 2,123,429, | July 12, | 1938. |

Each of these was briefly analyzed by the examiner, as hereinafter set forth.

They are also listed by the board and separately referred to in the text of its decision.

In the examiner's statement certain drawings stated to be from Reports 460 and 610 of the National Advisory Committee for Aeronautics (subsequently referred to as N.A.C.A.) are reproduced with comment, and in the decision of the board they are discussed along with certain of the patents formally listed as references, but the reports themselves are not so listed, and we have been somewhat puzzled as to their technical status in the record. All that the brief of the Solicitor for the Patent Office says concerning them is that the figures speak for themselves. In the brief for appellants, while they are discussed at length and as if they were references, it is said: "The Primary Examiner refers to the N.A.C.A. four digit and five digit families merely as a part of the review of airfoil theory in his statement * * *. At no point in his statement does he attempt to employ these families as references on which to reject the appealed claims. Therefore, it is difficult to understand the inclusion of the N.A.C.A. families of airfoils by the Board of Appeals with the references relied on by the Examiner to support its conclusion that the profiles shown in the references relied on and the profiles of the four digit and five digit families of airfoils, as well as that of Appellants have the same general form and outline * * *, when even the most superficial comparison shows that they are all radically and materially different one from the other."

From our study of the record, we are of opinion that, even if intended as formal prior art references, they are only cumulative and consideration of them is not essential in deciding the case.

In the final decision of the examiner he made reference to a patent to one (B.N.) Wallis. It was not listed as a reference and was not referred to in his statement following the appeal to the board, nor did the board refer to it. Notwithstanding this it was included in the record certified to us with the appeal, and it is discussed (we assume as a matter of precaution) in the brief for appellants, which, of course, was filed before that of the Solicitor for the Patent Office. In the brief of the latter it is said: "The patent to Wallis, No. 2,157,- 042 * * *, was not discussed either in the examiner's statement or in the Board's decision, and hence is not now advanced as a reference patent."

So, no further attention to the Wallis patent is required here, and only those patents specifically listed in the examiner's statement and repeated in the board's decision will be considered as the prior art.

We note that in the brief of the Solicitor for the Patent Office it is said: " * * * Generally speaking, the several reference patents contain much that is not directly

pertinent to the claims and issues under review. *The pertinent portions are, indeed, brief."* (Italics supplied by us.)

A study of the references confirms the correctness of the observation.

While appellants' specification describes their claimed profile in mathematical detail, using mathematical terms, their brief states, in substance, that it does not appear necessary to an understanding of the terms of the claims to go into the mathematics involved, and this view is supported in the brief of the Solicitor for the Patent Office.

As an aid in describing the profile, we here reproduce the two figures of appellants' drawings.

INVENTORS
Costas E. Pappas
Morvin G. Harrison
Hoohen R. Lu
BY
Charles S. Wilson
ATTORNEY.

Appellants' specification states: "Mathematical analysis and wind tunnel tests both demonstrate that the closest approximation to the ideal 'high limiting' Mach number' airfoil for very high speeds is attained when the leading portion of the profile of the airfold comprises a substantial ellipse having its longitudinal axis extending in the general direction of the flight of the airfoil and with vertex coinciding with the leading edge of the airfoil."

It may be observed from an inspection of Fig. 1, *supra,* that appellants disclose a basic profile OBCC' B' O, the rear portion being the *curved dotted* line running from C to C'. The profile so shown is a perfect ellipse, and O is at its so-called "leading edge."

As we understand it, the section illustrated by the curved dotted line running aft the perpendicular line from C to C' is not made a structural part of the profile, but beginning at C and C' the ellipse merges with or is blended into a cusped section outlined by CDC' which constitutes the trailing edge of the profile, such trailing edge being relatively sharp as shown by the slope of the tangential lines from C and C' to D. In the actual structure the elliptical portion, referred to as the forebody, ends as indicated by the perpendicular line CC'.

The specification of the application states: "Should the ellipse of the leading portion or forebody of the airfoil be uniformly continued to and including the trailing edge, the latter would be too blunt and too thick aerodynamically. Therefore a relatively sharp trailing edge portion is developed and provided, smoothly blending with the elliptical forward portion of the airfoil."

In Fig. 1, *supra,* the line drawn horizontally through the center is intended to indicate what is called the chord of the profile. This feature, together with other features shown in the drawings, is described in the decision of the board as follows:

"* * * A straight line extending from the leading edge to the trailing edge is named in the art "a chord" and it is illustrated in Fig. 1 of the application drawing

as O-x. In the design of a profile, the distribution of what appellants term "thickness" is first considered. The quoted term refers to the vertical measurements of the basic design before it is distorted by bending its horizontal axis. Applicants distribute the thickness in accordance with the contour illustrated in Fig. 1. This contour commences at the "leading edge" by a circular arc merging above and below the axis into elliptical arcs. The latter terminate at the points C and C' where they tangentially merge into somewhat straighter lines, the latter converging to meet the chord at the point. The thickness distribution is represented by a symmetrical outline as shown in Fig. 1. The section or profile of the airfoil may be modified from this outline in the manner shown in Fig. 2. In effect, this modification consists in applying a camber to the chord as shown at i in Fig. 2. The camber line is obviously somewhat longer than the chord and the elliptical and other portions of the profile are modified by making their shortest distances from points on the camber line i equal to their vertical distances from the chord as measured on the basic thickness distribution profile shown in Fig. 1. This modification by the application of a camber to the chord in effect bends the profile from its symmetrical form as shown in Fig. 1 to the form shown in Fig. 2. The camber is normally in the upward direction and has its effect upon the properties of the airfoil, modifying its lift, its drag and other features.

"The disclosure also specifies that the point C, at which the elliptical part of the outline terminates, is at a point 65 per cent of the length of the chord from the leading edge. This obviously requires the tapering "afterbody" profile to extend 35 per cent of the length of the chord."

It may be said that the circle shown adjacent the leading edge in both figures, identified by "k" in Fig. 1, is referred to in the specification as an osculatory circle-i. e., it touches the line of the ellipse at at least two points. It does not appear to have any particular significance relating to the issues before us, and the same is true of features identified by various other

small letters. The letter "i" in Fig. 2 identifies a "mean camber line" which the specification says may be of any desired shape.

The claims of course read upon the particular features of the drawings which have been described and no further analysis of the drawings seems to be necessary.

We here quote the examiner's description of what he evidently regarded as the pertinent features of the several references listed:

(In describing the Herrick patent certain of the letters used as indicators of features were included by the examiner. Since we do not reproduce the Herrick drawing because it is thought his profile may be visualized without it we omit the designating letters as indicated by asterisks.)

"Herrick

"This patent shows a profile which is adapted for use in either direction of operation. For this reason it does not have the customary sharp trailing edge.

"In describing the profile the patentee states:

" 'A very satisfactory method of deriving the symmetrical profile or contour of the wing is to distort an ellipse whose original major axis is the chord of the profile and whose minor axis is the maximum thickness * * *.'

"In Fig. 1 the patentee shows how this is carried out. The ellipse * * * is layed [sic] out with * * * a major axis and * * * a minor axis. A mean camber line in the form of an arc is drawn through [the profile from end to end]. This happens to be a circular arc but obviously other curves may be chosen as the patentee states, for example, a conic section curve or arc of any suitable mathematical curve.

"The ordinates of the ellipse * * * are transposed so that the minor axis is * * * [as indicated by a perpendicular center line] and the ellipse assumes the shape shown in full lines * * *.

"Mitsubishi

"This patent shows a wing composed of an elliptical spar which comprises the fore-body of the wing to which is attached a cusped trailing edge.

"Klemm

"This patent is similar to Mitsubishi. The patentee states, on line 21 of page 1, that the wing is provided with an elliptical spar cross section. To this is attached a cusped trailing edge.

"Stalker

"Particular attention is directed to Figs. 13 and 14 which show the manner in which the profile is layed [sic] out by applicant to be conventional. In other words, the mean camber line is drawn and then using this as a line of centers circles are drawn with the profile curve tangent to those circles.

"Taylor

"This patent has for its object to provide an improved form of profile for the purpose of delaying the occurrence of velocities equal to the speed of sound on the airfoil surface until higher speeds are attained than would be possible with wings which have the point of maximum thickness between 20 and 30 percent of the chord.

"To accomplish this result the patentee suggests that the point of maximum thickness be moved progressively toward the rear of the section.

"Ludington et al.

"The teachings of this patent are similar to Taylor. Figs. 3A, 3C, 7, and 8 all show profiles with the thickest section near the midpoint of the chord."

The examiner finally rejected all the claims before him (8-14, and 19) "on Herrick, Klemm, or Mitsubishi taken with Taylor or Ludington, et al."

The major portion of his discussion accompanied his rejection of claim 8. Claims 9 and 11 he held to be similar to claim 8 but "broader in scope." They were held to read directly "on the Klemm and Mitsubishi patents," and the other patents were not referred to in rejecting those two.

As hereinbefore stated, those three claims are not before us for consideration, but it has been found necessary to make some study of them, because the examiner's prin-

cipal discussion of the prior art is found in connection with claim 8, as has been stated, and most of the discussion of the prior art by the board is found in connection with its affirmance of the rejection of claims 9 and 11.

The board made no specific reference to either claim 10 or 12. Of the latter the examiner said only, "Claim 12 is similar to claim 8 and stands rejected for the same reasons." Of the former he said:

"Claim 10 is similar to claim 8 and stands rejected on the same references for the same reasons. The definition limits the minor axis of the elliptical forebody to a position at 40% of the chord. This is just another way of expressing in an indirect manner the length of the wedge-shaped trailing edge with relation to the forebody. By varying the length of the wedge-shaped trailing edge the location of the minor axis with respect to the wing chord can be varied in percent of the total chord."

It is noted that a feature of claim 10 is the specification that the transverse axis of the airfoil section is "at a point situated aft from the leading edge approximately forty per cent (40%) of the length of the chord." That percentage feature, which is similarly expressed in appealed claims 13, 14, and 19, does not appear to have been in any one of claims 8, 9, or 11.

The feature of an axis cambered with respect to the chord of the airfoil is recited in only claim 12 of the claims before us. It was not present in either claim 8, 9, or 11. Appellants' brief seems to make it clear that this feature is not relied upon to lend patentability to the claim.

Claim 10 defines the transverse axis indicated by the line BB' as being situated "aft from the leading edge approximately forty per cent (40%) of the length of the chord [OD]." It is thus defined also in claims 14 and 19. There was no reference to its situation in claim 8 or 9 or 11.

Claim 12 defines the major axis of the forward portion of the ellipse, identified by that portion of the so-called chord line OD, extending from O to the perpendicular line CC' as "extending aft from the leading edge a distance approximately equalling sixty-five per cent (65%) of the [over-all] length of the chord." It is thus defined in claims 13, 14, and 19, and was so defined in claim 8.

A feature named in claims 12 and 13 is "a high limiting Mach number." This is defined in the footnote, *supra,* as the ratio of the velocity of an airfoil in flight to the speed of sound. In claim 11 "a high limiting Mach number" was specified. It was not present in claims 8 and 9, nor is it found in any other of the claims before us.

Claims 13, 14, and 19 all define a maximum thickness—i. e., a thickness on a line normal to the chord OD (or Ox) of "about eighteen per cent (18%) of the length of the chord." No percentage factor is designated in claim 10 or 12, nor was any expressed in claim 8, 9, or 11.

Claim 19 embraces all the percentage recitals of claims 12, 13, and 14, and in addition thereto recites that the afterbody [the portion shown between the perpendicular line CC' to D] extends "over substantially 35% of the chord [OD]."

The board said of the claims now before us that they are more specific to the proportions and dimensions of the profile than claims 9 and 11, and that claim 19 may be taken as illustrative of them.

Omitting, as indicated by asterisks, what the board said of the N.A.C.A. reports, which, as has been stated, we deem merely cumulative, its discussion of claim 19 is as follows:

"* * * This claim specifies that the elliptical forebody of the airfoil section extends approximately 65 per cent of the length of the chord from the leading edge. The patent to Herrick discloses a symmetrical, elliptical body of the basic thickness contour in which the elliptical portion extends aft 100 per cent from the leading edge. Certainly, if a tapering afterbody of the character disclosed in the Mitsubishi and Klemm patents were applied to the Herrick section, the forebody would extend at least approximately 65 per cent of the length of the chord. However, it is the position of the Primary

Examiner that such features as the location of the termination point of the elliptical forebody, the maximum thickness and its location are matters of design and not invention. It is not clear that any surprising results have ensued because of these features.

\*    \*    \*    \*    \*    \*

"\* \* \* The patent to Taylor clearly directs the movement of the point of maximum thickness aft from the normal position at .35 of the chord in the profile of an airfoil designed for high speed of the character of that referred to by applicants. It is our view that the prior art suggests every feature of the section defined in the claims and that the claimed section does not depart from the prior art sections to an extent resulting in a difference in kind. The affidavits of record do not establish that the proportions claimed are critical nor that a departure from these proportions has resulted in failure or markedly decreased efficiency of airfoils otherwise constructed in accordance with the claims."

In previous parts of its decision the board had stated that the patent to Herrick "discloses an airfoil in the form of a wing which has a profile which is derived from a basic thickness distribution contour in the form of an ellipse"; and that the profile section of the wing referred to as "oval" in the Mitsubishi specification may "reasonably be translated as 'elliptical'." (It is noted that this is a French patent issued to a Japanese firm, published September 14, 1928.)

The portion alluded to is shown as 2 in Fig. 2 of the patent drawings. To us it seems to be clearly elliptical in shape. We note, however, that the board said: "\* \* \* The patentee does not disclose that the portion 2 is given its form because of any aerodynamic considerations but instead is concerned primarily with the structural features of the wing."

As to the Klemm patent which the examiner described as being "similar to Mitsubishi," meaning, we assume, with respect to the elliptical feature, the board said: "\* \* \* [It] discloses an aircraft wing which, when completed, will have a profile consisting of an elliptical forebody \* \* \* and an afterbody \* \* tapering aft from the maximum thickness of the contour to a relatively sharp trailing edge. Inspection of the drawing of the Klemm patent does not reveal that the forebody \* \* \* is elliptical and it is described as forming with the member 3 'an egg-shaped cross section.' It is, however, clearly described on page 1, first column, line 21 as 'elliptical'."

Continuing the board said: "\* \* \* If it is found that the Mitsubishi patent or the Klemm patent cannot be reasonably said to disclose an elliptical forebody, we are of the opinion that it would not involve invention to modify the profiles disclosed in these patents to make them truly and mathematically elliptical in view of the Herrick patent. This patent discloses a truly elliptical basic thickness distribution contour \* \* \*, having the chord or major axis \* \* \*. The airfoil section is derived from this basic distribution contour in exactly the same manner that applicants derive their section from the basic contour, that is, by use of the contour line \* \* \*, which results in the airfoil section shown in full lines on the drawing. This airfoil section is symmetrical in its forward and after portions apparently for the reason that the patentee desired to operate it in either of two opposite directions as in a reversible thrust propeller. It is also apparent that it would involve no invention to provide the airfoil section disclosed in the Herrick patent with the usual sharp trailing edge in view of the Mitsubishi patent, the Klemm patent as well as other references of record."

Of the feature, "a high limiting Mach number," named in claims 12 and 13, the board said, in discussing it in connection with its approval of the examiner's rejection of claim 11: "\* \* \* The quoted phrase might be considered as a functional phrase so that one would expect that an airfoil made with a forward portion and an after portion in accordance with the terms of the claim would, because of these

features, have a high limiting Mach number. If this is the fact, then obviously the airfoil sections disclosed in the prior art patents, such as the patent to Mitsubishi, would also have a high limiting Mach number. However, the only limitative meaning which can be said to be imported into the claim by the quoted phrase is that the airfoil made with the section defined in the claim has a feature which will give it a high limiting Mach number. A Mach number is the quotient of the speed of air and the speed of sound. It is used in compressibility calculations. We have found no definition of the term "limiting Mach number" but the "critical Mach number" is the Mach number at which air attains the speed of sound when flowing past some point on an airplane."

As we understand the foregoing, it simply means that a high limiting Mach number—"the ratio of the velocity of an airfoil in flight to the speed of sound"— is a result which flows from the arrangement followed in appellants' structure and that such result would flow from the arrangement of structure in the prior art.

This does not seem to us to be a particularly material limitation in the two claims. We do not understand appellants to contend that it is a critical feature, but, however, this may be, it is not regarded important in view of our conclusion upon the case as a whole.

There are certain affidavits in the record which we have studied with care and found helpful to an understanding of appellants' device. It is noted that the board said of one of them: "The affidavit of Mulholland is convincing that the design of an airfoil in accordance with the application on appeal, because of the mathematical nature of the outline of its profile, facilitates the calculations involved in developing the airfoil. It may be conceded that calculations of properties of any bodies of the character of airfoils are facilitated if the forms may be defined in mathematical terms but this does not import invention into the claims."

While we do not rest our conclusion upon the affidavits presented, we have the feeling that they are entitled to more weight in determining the controversy than the tribunals of the Patent Office felt was their due.

In view of our conclusion, based upon the facts found and descriptions recited, we do not deem it necessary to quote, or paraphrase at length, the arguments presented on behalf of appellants.

The claims before us are combination claims in which the individual features that make up the combination are quite distinctly specified. The cited prior art, of course, does not disclose any such combination, nor does it seem to us to suggest such a combination.

So far as individual features are concerned, it is true that Herrick indisputably discloses a perfect geometrical ellipse (it is insisted on appellants' behalf that his is the only prior art reference "that discloses, describes, or even mentions an ellipse in defining the profile of an airfoil"), but it must be remembered that Herrick's profile purports to be designed for operation in either direction—that is, for flying either forwardly or backwardly —(incidentally it is said to be applicable to windmills as well as to airplanes) and has the same thickness of edges. It is not seen how it could be combined with a cusped trailing edge. At any rate, there would seem to be no point in making such a combination, assuming it to be possible.

As already has been indicated herein, an inspection of the Mitsubishi drawing leads us to conclude that its profile, while described as oval is, in fact, an ellipse in the strictly geometrical meaning of that term, but it does not appear in the same structural arrangement, nor is there any satisfactory teaching that its purpose in the patent corresponds to the purpose of the elliptical portion of appellants' profile.

It seems to be conceded that in order to make the prior art conform to the provision in claim 19 (the only claim in which it appears) of "an afterbody extending over substantially 35% of the chord * *" material modification of such prior art would be required.

■ In nearly all cases where the individual features of combination claims can be met only by modification of individual features found in prior art, difficulty arises in determining whether invention is present. The courts generally have been accustomed to resolve doubt on the question of patentability in favor of applicants. This court has considered that to be a "well established rule." In re Herchenrider, 117 F.2d 261, 28 C.C.P.A., Patents, 876.

■ It is our conclusion that the instant case is one in which the rule should be applied, and it is so adjudged.

The appeal is dismissed as to claim 9, and the decision affirming the rejection by the Primary Examiner of claims 10, 12, 13, 14, and 19 is reversed.

Reversed.