**1374**

59 CCPA

**Application of James Lenhart MIXON, Jr. and Frederick William Wahl.**

**Patent Appeal No. 8632.**

United States Court of Customs and Patent Appeals.

Jan. 18, 1973.

Gerald K. Kita, Washington, D. C., attorney of record, for appellants; Jay L. Seitchik, Jay M. Cantor, Washington, D. C., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents; R. V. Lupo, Washington, D. C., of counsel.

Before WORLEY, C. J., and RICH, ALMOND, BALDWIN and LANE, Judges.

WORLEY, Chief Judge.

This appeal is from the decision of the Board of Appeals affirming the examiner's rejection under 35 U.S.C. § 103 of claim 3 [1] as obvious to one of ordinary skill in the art in view of patents to Hedler [2] and Matthysse.[3]

Appellants' specification delineates the problem which they state the electrical utility industry faced in making satisfactory electrical and mechanical connection between power lines using so-called plug-insert type wire connections:

> Plug-insert type wire connectors have long been known, particularly in the electrical utility field. These plug-inserts may take the form of parallel-sided plugs or more often wedges which are driven into corresponding connector housings containing one or more conductors. Use of such connectors soon revealed that when subjected to temperature variation, vibration and other environmental conditions, the conductors would often work loose thereby exposing the interior of the connection to corrosion and gradually reduce contact areas resulting in a poor connection, destructive arching [arcing?], and even pulling completely apart with the consequent danger to the community, of interruption of service and downed live wires. To overcome this disadvantage, screws, bolts, cotter pins, or the like, are often used in conjunction with solder or potting compounds to secure these connec-

1. Appearing in application serial No. 635,-260, filed May 1, 1967, as a continuation of serial No. 341,223, filed January 30, 1964, and entitled "A Method of Forming a Plug Insert Type Electrical Connection."

2. U. S. Patent No. 2,060,864, issued November 17, 1936.

3. U. S. Patent No. 3,065,449, issued November 20, 1962.

tions. Thus, there has long existed a need for a simple, quick, inexpensive, and effective way to permanently lock and secure these otherwise highly desirable plug-insert type connections.

Appellants' solution to that problem is reflected in process claim 3, read in conjunction with Figures 1, 2 and 4 of the drawings which show the parts utilized and the completed structure:

**Fig. 1**

PA 8632
[A8006]

**Fig. 2**

**Fig. 4**

[A8010]

3. The method of forming a plug-insert type electrical connection comprising the steps of grasping a connector housing [CB] with a conductor [CM] disposed along a conductor-receiving area [1] thereof, *maintaining said connector housing in a stationary position,* introducing a wedge-plug [W] into said connector housing with a conductor-engaging area [2] disposed in engagement with said conductor, driving said wedge-plug into said connector housing by a driving means thereby compressing the conductor between said conductor-receiving area and said conductor-engaging area, and *simultaneously riveting* a portion [11] of a trailing end of said connector housing against a trailing end of said wedge-plug by the driving means during the driving of said wedge-plug into said connector housing. [Emphasis supplied.]

In brief, appellants' position here is that neither of the prior art references relied on by the board recognizes the existence of the problem they faced of separation of connector elements. Nor, they argue, do those references suggest their solution to that problem which involves turning over or swaging a portion of the trailing end of the conductor housing to lock in the trailing end of the plug while driving the plug into the housing. As a further point, appellants maintain that the references, particularly Hedler, do not suggest maintaining the conductor housing in stationary position while driving the wedge into it, as recited in the claim.

The board did not agree with appellants' conclusions as to non-obviousness of the claimed subject matter, nor do we. Turning first to the references, Matthysse describes as his invention a solderless, plug-insert type conductor connection which "eliminates the need for screws, bolts, wedges or compression tools in assembling the connection." According to Matthysse, such prior art devices were used in connectors but "have proven to be unsatisfactory due to their mechanical instability or inconvenience." As illustrated in Figures 5 and 7, Matthysse's connector comprises elements similar to those employed by appellants.

**FIG.5**

**FIG.7**

PA 8632
[A8009]

The connection is assembled by inserting a screw driver or pliers into hole 18 in resilient housing 10 to successively engage depressions 22–28 in tapered insert member 12, whereby the insert is moved into location between the conductors 14 and 16 and clamps them against the resilient side walls of the housing.

Hedler discloses a different form of wedged connector wherein the trailing edge 24 of the "end fitting" or connector housing 12 is swaged or peened over

to retain the tapered wedge member 14 in securing relation with cable 10 after a hammer device is used to force the housing over the wedge.

Fig. 1

[A8008]

The examiner pointed out—correctly, we think—that Hedler also fairly discloses that "turning over of end portion 24 can be started during and simultaneously with the driving of the wedge elements into the housing."

We share the board's view that locking the wedge or tapered insert member of Matthysse in its housing by riveting or turning over at least a portion of the trailing end portion of the housing against the wedge, as suggested by Hedler, would be prima facie obvious to one of ordinary skill in the art. In response to appellants' argument regarding maintenance of the housing in stationary position while driving the wedge into it, the board found, and we agree, that it is of no real consequence in appellants' process whether the wedge or connector housing partakes of absolute motion in space, for all that is necessary to effect the connection is the imparting of relative motion [4] between the wedge and housing.

Appellants' stronger argument for non-obviousness, we feel, is that the electrical utility industry apparently had experienced a long-felt but unsatisfied need for a solution to the problem of how to obtain an easily fabricated, secure con-nection between power line wires prior to their entry into the field, a factor to be given consideration in determining patentability under § 103. See Graham v. John Deere Co., 383 U.S. 1, 17, 86 S. Ct. 684, 15 L.Ed.2d 545 (1966). The Matthysse specification, filed in 1958 long after Hedler appeared on the scene, provides some evidence of not only art-recognition of the problem but also its then current existence in stating that elements of prior art connectors "have proven to be unsatisfactory due to their mechanical instability or inconvenience." Moreover, appellants' solution to that problem appears to be rather a simple expedient, or so they argue, and simplicity itself has on occasion been held to be an indicia of non-obviousness. See In re Sporck, 301 F.2d 686, 49 C.C.P.A. 1039 (1962); In re Osplack, 195 F.2d 921, 39 C.C.P.A. 932 (1952), and cases cited therein. At the same time, however, appellants' arguments are tempered by the fact there is little, if any, tangible evidence to support a contention that their invention actually has provided a long-awaited, widely-accepted, and promptly-adopted solution to the problem extant in the art, or that others, particularly Matthysse, had tried but failed to solve that problem. See In re Allen, 324 F.2d

4. For that matter, Matthysse appears to hold the connector housing stationary while prying the insert member into engagement with the conductors.

993, 51 C.C.P.A. 809 (1963); see, generally, In re Cable, 347 F.2d 872, 52 C.C.P.A. 1561 (1965), and cases cited therein.

Suffice to say that, on the evidence and arguments before us, appellants have not persuaded us that the board committed reversible error in holding that the subject matter as a whole would have been obvious to one of ordinary skill in the art. The decision is affirmed.

### Affirmed.

### Supplemental Opinion

Inasmuch as this is doubtless my last opinion as Chief Judge of this court, I take this opportunity to make a few personal observations. What I say now is solely in my individual capacity as a member of this court for the past twenty-two years. During that time I have resolved reasonable doubt on questions of patentability in favor of the inventor, never sure whether I was helping or harming him, the public or the patent system.[5] Frankly, the issue of obviousness of appellants' process here is sufficiently close to me to justify consideration of the policy behind our "resolution of doubt" practice which began during the early days of this court's jurisdiction in patent matters.[6] The last occasion on which this court overtly applied the "rule of doubt," as it has come to be called, was in In re Hofstetter, 362 F.2d 293, 53 C.C.P.A. 1545 (1966), cert. granted sub nom. Brenner v. Hofstetter, 386 U.S. 990, 87 S.Ct. 1304, 18 L.Ed.2d 333 (1967), vacated, 389 U.S. 5, 88 S.Ct. 29, 19 L.Ed.2d 5 (1967), appeal dismissed, 55 C.C.P.A. 1493 (1967), although it was further discussed and defended in In re Warner, 379 F.2d 1011, 54 C.C.P.A. 1628 (1967).

However, with the passage of time, it seems that we are now the only court in our judicial system which has continued to follow the policy—and it is nothing more—of resolving doubt in favor of applicants for patents.[7] The question arises in my mind whether this court should pursue its lonely course—whether the rule of doubt applied in *Hofstetter* and its many predecessors should remain the law. I question both the desirability and wisdom of continuing such a course. On otherwise substantially identical records, it makes little if any sense to allow the fortunes of patentability to be potentially determined by the route of review—to this court (35 U.S.C. §§ 141–144) which has followed the rule of doubt policy, or to the District Court and Court of Appeals for the District of Columbia Circuit (35 U.S.C. § 145) which do not—chosen by an applicant dissatisfied with the decision of the board. Nor does it make sense to accord

---

5. A system that, though often overlooked, misunderstood, maligned in some quarters and occasionally in distress, has nevertheless proved of incalculable benefit to the economy of our country and to its leading role in world affairs. As a friend of, and believer in, the system, I trust it will continue to do so.

6. See, e. g., In re Uddenborg, 39 F.2d 710, 17 C.C.P.A. 1016 (1930); In re Kirby, 109 F.2d 786, 27 C.C.P.A. 919 (1940); In re Pappas, 185 F.2d 695, 38 C.C.P.A. 746 (1950); In re Franz, 190 F.2d 86, 38 C.C.P.A. 1206 (1951); In re Twomey, 218 F.2d 593, 42 C.C.P.A. 742 (1954); In re Hummer, 241 F.2d 742, 44 C.C.P.A. 814 (1957); In re Sporck, supra.

7. The development of "the rule of doubt" as a rule of law in the Patent Office, in the Court of Appeals for the District of Columbia Circuit, and in this court is fully traced in Lambert, Patentability—Rule of Doubt, 12 Idea 703 (Spring 1968); Becker and Heller, The "Rule of Doubt" . . . In re Hofstetter, 49 JPOS 607 (August 1967); and In re Hofstetter, supra, and need not be reiterated here. The chronology of the subsequent demise of that rule everywhere but in the Court of Customs and Patent Appeals is also catalogued in those sources.

a duly issued patent a presumption of validity [8] when its issuance is dependent on resolving an admitted doubt as to the very issue of validity in the applicant's favor. I cannot believe Congress ever contemplated that the granting of a patent monopoly would turn on a resolution of doubt. For those reasons, and in the interest of judicial uniformity and certainty, I think it is time to join our sister courts [9] and the Patent Office [10] in abandoning the rule, a rule which has never had any statutory support, which appears in derogation of policy expressed by Congress in 35 U.S.C. § 282, and which is, at best, of questionable benefit to the inventor, the public, and the patent system.[11]

For the benefit and guidance of litigants, I am satisfied that sooner or later this court should re-examine its now unique position regarding the "rule of doubt."

RICH, ALMOND, BALDWIN, and LANE, Judges (concurring).

We concur in the opinion. Since we have not been following any "rule of doubt" policy and since that question is not involved in the present case we do not agree with the additional comments of the author.

8. Congress has provided in 35 U.S.C. § 282:
    § 282 Presumption of validity; defenses
      A patent shall be presumed valid.
    * * *

9. See, e. g., Reynolds v. Aghnides, 123 U.S. App.D.C. 28, 356 F.2d 367, (1966); cf. also Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657 (1894).

10. Subsequent to Graham v. John Deere, 383 U.S. at 18, 86 S.Ct. 684, the Patent Office itself has cast aside the rule. See Brenner, Patent Office Activities During Fiscal Year 1966—Outlook for Fiscal Year 1967, 48 JPOS 475, 476 (August 1966); Address by Com'r Bren-

60 CCPA

ner to the Patent, Trademark and Copyright Section of the American Bar Assn., Montreal, Canada, August 6, 1966, 829 O.G. 1309.

11. Cf. dissenting opinion in In re Arkley, 455 F.2d 586, 59 C.C.P.A. 804 (1972), wherein it was observed that:
    In * * * [resolving doubt on the issue presented in favor of the applicants], this court is not doing the applicants or the public any favor. Rather it is bestowing on the applicants a license to litigate of dubious validity at a time when, it is reliably estimated, 80% of contested patents are being held invalid in other federal courts.