49 CCPA

**Application of Gordon H. JONES.**
**Patent Appeal No. 6749.**

United States Court of Customs
and Patent Appeals.
Feb. 13, 1962.

———◆———

Wolfe, Hubbard, Voit & Osann, Chicago, Ill. (Richard Russell Wolfe, Chicago, and William A. Smith, Jr., Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Joseph F. Nakamura, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, MARTIN, and SMITH, Judges, and Judge JOSEPH R. JACKSON, Retired.

WORLEY, Chief Judge.

This is an appeal from the decision of the Board of Appeals affirming the rejection by the Primary Examiner of all three claims in appellant's patent application Serial No. 588,798 filed June 1, 1956, titled "Process of Machining."

Claim 1 is representative and reads:

"The process of machining a workpiece from numerical data computed directly from a design drawing of the piece and without any intermediate step of fashioning patterns, templets, control cams or the like, which comprises, applying digitally to a record device the precise numerical values, including their signs, of the incremental changes between successive sets of coordinates which fix the locus of successive increments of motion of a cutter required to produce the designed shape on the workpiece and also applying to such device the precise numerical value of an assigned time period for completing each such increment, converting said numerical values into a plurality of modulated signal traces on a magnetizable tape or the like with one trace for each coordinate and in which each trace modulation varies during each assigned time period in a sense and by an amount corresponding respectively to the sign and numerical value of the incremental change of the coordinate which said trace represents, transporting the tape to the site of a machine tool which has variable speed, reversible drive mechanisms for effecting relative movement between a cutter and a workpiece in each of the several directions of said coordinates, and utilizing the traces on said tape to modulate correspondingly the operation of respective ones of said drive mechanisms while machining the workpiece."

The following references were relied on by the board:

Leaver et al.    2,475,245    July 5, 1949
Livingston et al.  2,537,770  Jan. 9, 1951

"A Numerically Controlled Milling Machine," published by Massachusetts Institute of Technology, Cambridge 39, Mass.  Preliminary Report published 1951, Part 1 of Final

Report published July 30, 1952, Part 2 of Final Report published May 31, 1953.

"Digitron," published by Parsons Corporation, Traverse City, Michigan, February 8, 1952.

Appellant's application discloses a process of machining workpieces of metal or other materials by using data derived from a design drawing to control a milling machine automatically. A study of the drawing of the article to be formed is first made to determine the machine movements and corresponding time periods necessary in the machining operation. The results are tabulated. Ordinarily the tabulation of movements is in terms of three right angularly related coordinates constituting the familiar "x," "y" and "z" axes of an orthogonal coordinate system since they correspond to the directions of relative motion of the workpiece and cutter customarily afforded in machine tools. The process then involves the following four steps:

1. Forming a digital record of the tabulated values representative of distance, direction and time for movements of the machine by punching said values in a tape, preferably according to the binary system of numbers.

2. Converting the numerical values on the punched tape into a plurality of modulated electrical signals, including a reference signal and a signal carrying the information necessary for controlling movement along each of the three coordinates, and recording the signals simultaneously on a magnetizable tape.

3. Transporting the magnetizable tape from the location where step 2 was performed to the location of the machine tool which is to machine the workpiece.

4. Playing back the magnetizable tape to reproduce the modulated electrical signals and applying those signals to control means associated with the machine tool.

The publication of Massachusetts Institute of Technology, comprising three reports and entitled "A Numerically Controlled Milling Machine," and the publication of the Parsons Corporation, entitled "Digitron," together describe a system for automatic control of a milling machine referred to by the Board of Appeals as the "MIT system."

That system utilizes data representing increments of relative movement of the milling machine cutter and workpiece, as well as the corresponding periods of time, determined from drawings of the workpiece to be produced. A first mechanism permits application of the data to a punched paper tape. Complex electronic mechanism then converts the data on the tape into modulated electrical signals representative of the movements along the x, y and z axes and the corresponding time periods. The signals are then applied to means which respond thereto to control the milling machine.

Referring to that system, the Parsons publication states:

"*Transmission of Digitron Data.* Since the punched tape is compact and easily portable, economies in computing and tape preparation might be effected by centralizing this function and having one organization process blueprints and provide punched tape for a number of different companies—in much the way that teletype news services now furnish coded punched tape which can be fed directly to typecasting machines. Telegraphic reproduction of the tape is also possible if desired."

The Livingston et al. patent discloses controlling the operation of a machine tool automatically by means of modulated electrical signals recorded on a magnetizable tape. The signals are originally produced from the tool movements which result while the tool is operated by manual control to machine the workpiece into the desired configuration. The signals are recorded on the tape. Playing back the tape reproduces the signals which are then applied to control means on the machine tool to cause a repetition of the original machining operation. Thus, additional pieces of work of the same configuration as that produced under manual

control can be produced automatically under control of the tape.

The Leaver et al. patent also discloses making a magnetizable tape recording of electrical signals representative of the movements of a machine tool in producing an article which it is desired to reproduce. It is disclosed that the recording may subsequently be employed to operate the same machine tool or a plurality of like machine tools.

The board regarded the claimed method as a modification of the MIT system with "the use of magnetizable tape to separate the system into components" being "the feature of the recited method upon which appellant is predicating patentability." Appellant does not dispute that evaluation but does argue that, if what he did "is a 'separation' of the MIT system, it is one that involved much more than a routine splitting of one operation into two parts." He contends that it "involved adding two steps to the previous procedure and resulted in advantages far out of proportion to what ordinarily might be expected."

It seems to us that what appellant has done is separate the MIT apparatus into two parts. The first part consists of the steps up to and including production of the modulated electrical signals which are suitable for application to the control device of the milling machine. The second part consists of the application of those modulated signals to the machine. To do that, appellant introduced the two additional steps of recording the signals produced from the first part of the process on magnetizable tape and then played back the tape to reproduce the signals.

The board referred to the portion of the Parsons publication quoted above and found "a clear recognition of the economic problem inherent in the MIT system and a suggested solution of that problem by the separation of the MIT system into components capable of being performed at different locations." Recognizing that the separation which Parsons describes is at the point where the data has been applied digitally to the punched tape rather than at the later point where appellant separates the system, the board further stated:

"* * * Once the separation of the MIT system had been suggested, it would appear to us that one skilled in the art would be led to consider other possible points of separation in order to concentrate as much of the system as possible at the central organization referred to by Parsons. We believe it would be obvious to the skilled worker that the point on the MIT system which would permit the maximum concentration of equipment at the central organization would be immediately prior to the machine tool. With the disclosure of Livingston et al. before him we are of the opinion that one skilled in the art would have the suggestion of effecting this separation of the MIT system by the use of magnetizable tape, wherein the electrical impulse trains of the MIT system would magnetize the tape of Livingston et al. and the magnetized tape used to control the machine tool in the manner disclosed by Livingston et al."

We find no error in the board's position. It is our opinion that appellant has done no more than modify the MIT system in a manner that would be obvious to a person of ordinary skill in the art in view of the Parsons publication and the Livingston et al. patent.

■ Appellant's affidavits showing that his process has enjoyed commercial success have been considered. Although commercial success may be relevant in a doubtful case of patentability, it may not be used to create a doubt on the question where none would otherwise exist. In re Coey et al., 190 F.2d 347, 38 CCPA 1200. We agree with the board that appellant has done nothing more than would be obvious to one of ordinary skill in this particular field at the time the alleged invention was made.

The decision is affirmed.

Affirmed.