58 CCPA

**Application of James R. TIFFIN and Earl Erdman.**

**Patent Appeal No. 8502.**

United States Court of Customs and Patent Appeals.

June 10, 1971.

Alvin Guttag, Washington, D. C., attorney of record, for appellants. William T. Bullinger, Washington, D. C., Sheldon F. Raizes, Wilmington, Del. (Cushman, Darby & Cushman), Washington, D. C., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. Fred E. McKelvey, Washington, D. C., of counsel.

Before RICH, ALMOND, BALDWIN and LANE, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 1–4, 7, 8, and 10–17 in appellants' application serial No. 555,922, filed June 7, 1966, as a continuation of application serial No. 261,683, filed February 28, 1963. We reverse.

## THE INVENTION

Appellants claim thermoformed, seamless containers useful as vending machine cups for high-temperature comestibles and methods for making them. Claim 1 (subparagraphing and emphasis supplied) is illustrative:

1. A process of thermoforming a closed cell thermoplastic resin foam sheet into a seamless container,

said sheet

being wrinkle and distortion free and

having a thickness of 60 to 300 mils and a density between 18 and 45 lbs./cu. ft. and

consisting of

(1) a closed cell foam resin core,

(2) a nonporous, smooth, tough resin outer skin on one side of the core, and

(3) a nonporous, smooth, tough resin skin on the other side of the core,

said core comprising over 50% of the total thickness of said skins and core,

said *core being integral with said skins*, and being composed of the identical material as said skins,

said skins having a substantially higher density than said core and

each skin being at least 3% of the total thickness of the skins and core,

said sheet having been formed by extrusion of a hot sheet of foamable thermoplastic resin and quench chilling [of] the surfaces of said sheet to form said skins on each side of said core,

said process comprising

supplying sufficient heat to thermoform said sheet and

thermoforming said sheet into a container having a core density of 12 to 45 lbs./cu. ft., said wall means [1] being in stretched condition.

The two characteristics of their invention on which appellants rely for patentability are the relatively high density of their foam and the "integral" skin which appellants obtain thereon by quench chilling the surfaces of the newly extruded sheets before they have foamed significantly. Their application discloses that the requisite quench chilling may be effected by means of blasts of non-reactive fluids (such as air and water) directed at the surfaces of the sheet immediately after extrusion. The process of thermoforming thermoplastic resin foam sheets into seamless containers is concededly old with other materials. However, appellants' containers are

---

1. In its opinion, the board called attention to several minor errors of form in the claims, including the fact that the expression "said wall means" lacks a proper antecedent in this claim. In their brief, appellants conceded that "these errors will have to be corrected" before issuance, but urged that the errors were "not before this Court for consideration" because no rejection was made thereon. Since the errors do not interfere with our understanding of the case, we agree that they may be overlooked for purposes of this appeal.

said to be sufficiently thin walled to be usable in vending machines (where the ability to stack many containers in a confined space is critical), yet to possess good insulation properties, and not to suffer from "delamination," a problem which plagued prior-art containers made from foam sheets onto which nonporous skins were laminated.

### THE REJECTION

The references are:

| | | |
|---|---|---|
| Nickolls | 2,893,877 | July 7, 1959 |
| Fox | 3,039,911 | June 19, 1962 |
| Koppers (Great Britain) | 854,586 | Nov. 23, 1960 |

Collins, "Controlled Density Polystyrene Foam Extrusion," SPE Journal, July 1960, pages 705–09.

Collins and Fox teach thermoforming of seamless containers from thermoplastic resin foam sheets having *laminated* skins. Nickolls teaches the preparation of low-density "laminar sheets" which "can be fabricated into trays by numerous conventional techniques." These "laminar sheets" consist of foamed polystyrene cores and thin skins of the same material, but unfoamed, which the patent teaches may be cemented to the core or formed in situ thereon by passing sheets of foamable polystyrene immediately upon emergence from extruder dies between water-cooled nip rollers, which cool the surfaces of the polystyrene creating skins of essentially unfoamed polystyrene on the still-foaming cores. Koppers similarly teaches the creation of a skin on extruded polystyrene by what it terms "shock cooling," but it teaches that the cooling may be accomplished by "a blast of compressed air" as the extrudate leaves the die orifice and that the "thickness of this skin may be varied by controlling the temperature of the air used and the time to which the foamed material is exposed to the air."

The examiner rejected all claims under 35 U.S.C. 103 as obvious in view of Collins or Fox supplemented by Nickolls and Koppers. His reasoning is rather neatly summarized in the following paragraph taken from his answer:

The rejection is based upon a combination of references under 35 U.S.C. 103. The person having ordinary skill in the art is considered to have all of the cited references before him. He reads the Collins article and finds that high density foam can be laminated to a high impact film and successfully formed by all the standard forming techniques, e. g. vacuum thermoforming. A laminate of this type, he is told, would produce an insulating package fulfilling such requirements as heat distortion, toughness, rigidity, thin wall and insulation. He tries out the process and visually inspects the product. It is readily observable (as stated by appellants and seen by the Examiner) that the product is unsatisfactory, one problem being delamination. What to do? He reads the Nickolls patent which says that an alternative to laminating discrete sheets is preparation of sheets directly by extrusion followed by surface chilling. This appears to be a rational alternative, it even eliminates some steps, but can it be used for making sheets to be vacuum formed. He reads on. Nickolls says it can. But Nickolls says chill the surface with cooled rollers, they are bulky and expensive, isn't there some other manner of heat exchange. The British patent (Koppers) says one can use a blast of air and furthermore by such you can readily vary the thickness of the skin. He tries the alternatives suggested by the art before him and obtains a product. Not quite perfect yet, he goes through routine testing of various foam and skin thicknesses and cell size to yield the known desiderata of adequate strength, insulation and fluid imperviousness. He has now obtained the claimed invention.

In succeeding paragraphs, the examiner conceded that appellants had proved that their containers were superior to the prior art and had been a commercial success, but dismissed appellants' objective evidence of non-obviousness as un-

persuasive because (1) appellants' affidavits of superiority "merely treat each reference as if it were applied in a 35 U.S.C. 102 rejection" (by which the examiner apparently meant that appellants' invention was compared with each prior art teaching individually) and (2) appellants' proof of commercial success could not "tip the scale of patentability" where "the rejection on the explicit teachings of the combination of references is not in doubt." The rejection, of course, was for obviousness.

The board affirmed, finding Collins to have taught how to thermoform seamless containers from thermoplastic resin sheets within the recitations of claim 1 except for the formation of the skins by quench chilling, which expedient it found to have been "fully disclosed" by Nickolls. In particular, the board found Collins' laminated skins to be "integral" with the core "within the well accepted meaning of this term," refusing to apply a meaning to the word other than its "accepted meaning" on the strength of In re Hill, 161 F.2d 367, 34 CCPA 1062 (1947). The additional limitations contained in the other claims it dismissed as "governed by the dimensions and other characteristics desired in the article being produced," and obvious to the person skilled in the art. As to appellants' objective evidence of non-obviousness, the board also conceded that appellants had

> * * * provide[d] a showing of commercial success of the cups made in accordance with appellants' disclosure, and also [had] provide[d] a showing of the superiority of these cups as compared to competitive cups * * *

but agreed with the examiner that the appellants' showing had not proved that "the subject matter of the claims involved is patentable." Finally, the board refused to consider appellants' argument based on the disclosure of a number of patents, applications for which had been filed *after* appellants' application, on the ground that it was "restricted to consideration only of subject matter which has a date prior to the effective date of the present application * * *."

## OPINION

### A. Does Collins Teach "Integral" Sheets?

There can be no doubt that appellants and Collins teach very different methods of obtaining the necessary nonporous skins on the insulating, foamed core. However, appellants' claims recite broadly that the foamed core is "integral" with the skins, and the board thought that Collins' core and skins were "integral" within the "accepted" meaning of that term. Moreover, in his brief on appeal the Patent Office Solicitor has pointed out that Collins' disclosure that his skins may be laminated to his core by heat alone, with no adhesive required, brings Collins' sheets within the following definition of the term "integrally united" taken from appellants' own specification: a direct union of the inner core with the outer skins without the use of an adhesive or other intermediate material." Nevertheless, we agree with appellants that,

> Considering appellants' specification *as a hole*[,] it is beyond dispute that those of skill in the art would be taught that *"integral"* meant the *skin* plus core concept of appellants and not the Collins laminate. [Emphasis in the original.]

We note particularly that all claims recite that the skins are formed by quench chilling the surfaces of an extruded sheet, and we have no doubt that in an infringement action they would be so limited notwithstanding any broader language in appellants' lexicography. Accordingly, we hold that the integral sheets of appellants' claims are not Collins' sheets, whatever the structure of the latter may be termed in other contexts.

### B. Should the Board Have Considered Post-Application Teachings?

Appellants cited thirty-four patents in the general field of foam resin contain-

ers in connection with their argument that their invention had solved a long-standing problem and had filled a long-felt need. Five of these patents had filing dates subsequent to appellants', and the board refused to consider them on the ground that it was "restricted to consideration only of subject matter which has a date prior to the effective date of the present application * * *."

■ With all due respect, we consider that acceptance of the above statement would set a dangerous precedent. Many of the familiar objective indicia of non-obviousness, the relevance of which is well established and was recognized by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), often depend on facts developed after application. Among these are commercial success, displacement of competing devices, copying of the invention by competitors (both before and after issuance of the patent), and general recognition and respect of the inventor's rights by the industry involved. For the board (or any other tribunal faced with the oft-times perplexing task of determining whether a given invention is patentable) to close its eyes to such evidence would be to deny itself access to some of the most reliable evidence of non-obviousness available. The board gave no authority for its position, and we know of none. It seems to have confused what may be deemed prior art to show obviousness with what evidence may be considered to show non-obviousness. Appellants have invited our attention to three separate occasions in recent years on which we have stated that evidence of non-obviousness which has developed only *after* the filing date of the application concerned cannot be ignored: In re Caveney, 386 F.2d 917, 923, 55 CCPA 721, 728 (1967); In re Warner, 379 F. 2d 1011, 1017 n. 7, 54 CCPA 1628, 1635 n. 7 (1967); and In re Hofstetter, 362 F.2d 293, 298, 53 CCPA 1545, 1550–1551 (1966). In sum, we think the board's

refusal to consider this evidence was clearly in error.

### C. *Was Appellants' Invention Prima Facie Obvious in View of the Prior Art?*

■ Collins discloses seamless containers thermoformed from both low and high density foamed polystyrene, preformed by lamination into sandwich sheets otherwise very like appellants' high density, formed-in-place integral sheets, and Nickolls discloses seamless containers made from *low* density foamed polystyrene, preformed into sandwich sheets by either lamination or a formed-in-place technique employing quench-chilling. Although appellants devote many pages of their long brief to arguing that the Patent Office's reconstruction of the elements of their claims from the references is contrary to the teachings of the prior art, we agree with the solicitor that the Patent Office made out a case of prima facie obviousness and that it was incumbent upon appellants to rebut that case, if they could, with objective evidence of non-obviousness.

### D. *Did Appellants Rebut the Patent Office's Prima Facie Case*

Appellants argue that their invention satisfied a long-felt need, that containers made by means of their invention are vastly superior to the prior and contemporaneous art, and that their invention immediately enjoyed great commercial success, all of which are strong evidence that their invention was not obvious to those skilled in the art at the time when it was made. The Patent Office conceded the superiority of coffee cups made according to appellants' invention "as compared to competitive cups" and conceded that appellants had shown that their invention had been a commercial success, but held that appellants' evidence had not overcome the prima facie case because the evidence establishing the superiority of their process compared the claimed process to the prior art processes individually, rather

than to the composite of the prior art processes fashioned by the examiner, and because the evidence of commercial success was not sufficient, "in the circumstances of this case, to tip the scale of patentability." The examiner cited In re Heinrich, 268 F.2d 753, 46 CCPA 933 (1959), for the former proposition, and the solicitor cites In re Rynkiewicz, 390 F.2d 742, 55 CCPA 977 (1968), and In re Jones, 298 F.2d 944, 49 CCPA 893 (1962), for the latter.

In addition to the four prior art references cited by the examiner, appellants cite 34 patents in the general field of foamed resin containers, arguing that "the vast amount of art in this area" proves that "there are real problems in forming a satisfactory hot beverage drinking cup from a foamed plastic material * * *." Additionally, and rather more to the point in the circumstances of this case, appellant submitted the affidavit of Stephen W. Amberg, Vice President of Research and Development of the Lily-Tulip Corporation,[2] who says that Lily-Tulip is "the leading manufacturer in the world of paper and plastic cups and containers," that, to the best of his recollection, cups and containers made of foamed polystyrene materials first appeared commercially in 1958, that these containers were not satisfactory for vending machine purposes because their wall thickness made them too inflexible for easy denesting and too bulky for use where space is at a premium (as it is inside a vending machine), that, at least as nearly as 1961, Lily-Tulip "fully appreciated and had an interest and desire in obtaining an all foam cup capable of being used in a vending machine," but that, as of 1963, Lily-Tulip was "*unable* to produce or *have produced* for them an all foam cup to meet these specifications" (i. e., usability in vending machines; emphasis in the origi-

nal), that in 1963 appellants' assignee demonstrated their invention to Lily-Tulip, that Lily-Tulip was "most delighted" to learn of appellants' advance, that it thereupon entered into an agreement with appellants' assignee licensing it to use the inventions of the instant application "and others relating to various aspects of the production of foam polystyrene receptacles," under which licensing agreement Lily-Tulip made an initial down payment of $300,000 and paid royalties of $50,000 in 1965 and $75,000 in 1966, that Lily-Tulip's sales of cups made according to the invention were "well into the millions," with "sales * * * rapidly increasing with the introduction of new assembly equipment," and that, in his opinion, "the commercial success that we [i. e., Lily-Tulip] have enjoyed in the marketing of the * * * [cups made by appellants' process] is primarly attributable to the quality of the product since *no* extensive amount of advertising was conducted on the cup." (Emphasis in the original.) Finally, appellants submitted extensive affidavit and exhibit evidence indicating that the prior-art laminated containers suffered from delamination, a problem not suffered by appellants' cups.

■ In the first place, we cannot agree that appellants' affidavits are irrelevant because they compare products of the claimed process to products of prior-art processes seriatim, rather than to products of the composite process fashioned by the examiner. The examiner's composite process *is* appellants' process, and thus cannot be compared with it. However, the question is whether, at the time appellants made their invention, it would have been obvious for those skilled in the art to have combined the prior-art processes in the manner set forth by the examiner and quoted supra, and on that question the

**2.** Lily-Tulip Cup Corporations is *not* the assignee of this application. It is, as the examiner pointed out, "an interested party" in the sense that it has been licensed by the assignee to use the trade secret embodied in this application, but that kind of interest adds to rather than detracts from the weight to be accorded the affidavit, so long as the licensing relationship is bona fide and was entered into at arm's length.

superiority of the products of appellants' process to the products of each of the prior-art processes is highly relevant. In re Schickh, 362 F.2d 821, 53 CCPA 1352 (1966). We find nothing in *Heinrich,* supra, to the contrary. The paragraph to which the examiner seems to have referred states merely that affidavits in which the affiants aver that claimed subject matter would not have been obvious to them despite their general familiarity with the art, without stating that the affiants were familiar with the principal reference, do not "afford convincing evidence" that the subject matter was non-obvious at the time it was invented. *Id.* 268 F.2d at 756–757, 46 CCPA at 938. While that proposition is unassailable, it seems irrelevant.

■ In the second place, we think the Patent Office has considerably underestimated the persuasive force of a good showing of commercial success flowing directly from the superiority of the claimed invention to its commercial rivals.[3] As the Seventh Circuit Court of Appeals said in Coltman v. Colgate-Palmolive-Peet Co., 104 F.2d 508, 511 (1939):

> Recognition by the trade is the best and most persuasive evidence that can be offered. The tribute of those engaged in the industries affected, especially when the tribute is evidenced by the payment of substantial royalties, is by far the most persuasive and unimpeachable evidence that can be offered to support the asserted validity of patent claims in litigation. Self interest of the licensee can be relied upon to prevent the payment of royalties, except for discoveries of recognized merit, and the larger and more numerous the royalty payments, the stronger the inference that payment is made only after the licensee has satisfied itself that the invention is meritorious and the claims covering the process of product are valid. [Footnote citing numerous authorities omitted.]

See also Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc., 436 F.2d 1180, 1187 (7th Cir. 1971). Where, as here, such evidence of commercial success is coupled with evidence of long-felt need despite the availability of the elements conjoined in the claimed invention[4]—which is practically a restatement of section 103, since the need would not have been long-felt if its solution had been obvious to those of ordinary skill in the art—and the evidence shows satisfaction of that need by the claimed invention and its superiority to the prior art, the case becomes highly persuasive. We find the prima facie obviousness to have been overcome.

The decision of the board as to all claims is *reversed.*

Reversed.

---

3. We recognize that the Amberg affidavit indicates that Lily-Tulip's licensing agreement with appellants' assignee was not for this application alone. However, the products of appellants' process clearly have the characteristics which, according to the affidavit, elicited Lily-Tulip's interest. While we would be less impressed if there were any evidence in the record that the technology which forms the basis of this application was but a tiny part of the consideration for which Lily-Tulip paid so handsomely, in the absence of such evidence, and since appellants clearly offered the affidavit to prove the value of their invention in the eyes of the commercial world (and are therefore subject to being held to appropriate account if their representation is false), we think their affidavit is sufficient to establish that the subject matter *of this application* enjoyed great commercial success which was not due to advertising or other extraneous factors.

4. Collins, the primary reference, was published in July 1960, and Nickolls, the principal secondary reference, was issued July 7, 1959, both considerably prior to appellants' February 28, 1963, filing date.